### KICINSKI v. CONSTABLE HOOK SHIPYARD, Inc.

No. 9392.

Circuit Court of Appeals, Third Circuit.

Argued April 20, 1948.

Decided May 24, 1948.

Theodore J. Breitwieser, of New York City (Alexander F. Ormsby, of Jersey City, N. J., and Julius A. Kepsel, of Hasbrouck Heights, N. J., and Thomas P. Mesick, of New York City, on the brief), for appellant.

Edward V. Ryan, Asst. U. S. Atty. of Newark, N. J. (Edgar H. Rossbach, U. S. Atty., of Newark, N. J., on the brief), for appellee.

Before GOODRICH and KALODNER, Circuit Judges, and FEE, District Judge.

KALODNER, Circuit Judge.

The petitioner in the court below, Harriet Kicinski, instituted this proceeding to enforce the rights of reëmployment afforded to her as a veteran by Section 8 of the Selective Training and Service Act, 50 U.S.C.A.Appendix, § 308.[1]

She waived any claim to reinstatement, and recovered a judgment for the loss in wages attributable to the refusal of Constable Hook Shipyard, Inc. (hereinafter referred to as the respondent), to "reëmploy" her. From that judgment this appeal was taken, the respondent contending here, as it did in the court below, that the petitioner was never in its employ and did not leave its employ to enter the service.

What would otherwise be a simple issue is beclouded by the fact that the tenancy of the situs of the petitioner's pre-induction activities changed hands. The question presented for determination, then, is whether the circumstances surrounding the succession of tenants was such that there existed an obligation on the part of the respondent toward the petitioner by reason of the Act.

Preliminarily, it may be stated that the petitioner was first employed, insofar as we are here concerned, on October 19, 1942, as an industrial nurse by Marine Maintenance Corporation (hereinafter referred to as "Marine") to do duty at the shipyard which it owned and operated in Bayonne, New Jersey. As a result of events later to be detailed, Marine went into bankruptcy and the premises were occupied by East Coast Shipyards, Inc. (hereinafter referred to as "East Coast"), for whom the petitioner continued to work until April

---

[1] This Section, insofar as it is pertinent here, and as amended by the Act of December 8, 1944, 58 Stat. 798, and reënacted June 29, 1946, 60 Stat. 341, reads:

"(b) In the case of any such person who, in order to perform such training and service, has left or leaves a position, other than a temporary position, in the employ of any employer.

*    *    *    *    *    *

"(B) If such position was in the employ of a private employer, such employer shall restore such person to such position or to a position of like seniority, status, and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so; *    *    *"

19, 1943, when she entered the Army. While she was in the service, East Coast evacuated the premises and they were then occupied by the respondent under a lease from the Trustee óf Marine. The petitioner was honorably discharged from the Army on September 28, 1945, and made timely application to the respondent for reëmployment in November, 1945, which was denied because no nursing position was available.

The trial court grounded its determination in favor of the petitioner on its fourth enumerated "finding of fact" that the "respondent assumed operation of the property, equipment and business of the aforesaid East Coast Shipyards, Inc. and there was and is privity of obligation between the respondent and the said East Coast Shipyards, Inc. and Marine Maintenance Corporation". However, the facts from which the learned trial judge deduced the above conclusion were not specifically found. The view was taken that there was "continuity or privity of relationship" between the respondent and Marine, as well; that the lease between the respondent and Marine "is in the nature of a working agreement, rather than a strict lessee and lessor arrangement"; and that East Coast was an operating corporation organized by the Maritime Commission for the purpose of operating the industrial plant which had been taken in condemnation proceedings by the United States.

An examination of the record made in the court below discloses that there was no controversy with respect to the facts, nor was there contradictory testimony on the issues relevant here. The sole problem was that of determining the consequences of the record thus established. With that in mind, we test the validity of the fourth finding of fact.[2]

During 1942, Marine was engaged in the repair of vessels for the War Shipping Administration, and in May had received a Maritime Commission contract for the construction of four vessels. In December, it was about to receive a Commission contract for the construction of twelve additional vessels when the hopeless state of its accounting methods, records and practices came to light. We have already had occasion to deal with one of the less attractive developments of that situation.[3]

While the men at the head of Marine were no longer acceptable to the War Shipping Administration, understandably the war effort required the participation of Marine's plant. Accordingly, beginning January 27, 1943, the shipyard at Bayonne was operated under a special arrangement, the then objectionable officers of Marine being ousted and a Maritime Commission man installed.[4]

However, about February 14, 1943, Marine's contracts were cancelled. On February 18, 1943, condemnation proceedings for use of the yard were begun, and shortly thereafter Marine took advantage of Chapter X, 11 U.S.C.A. § 501 et seq. On that date, East Coast was placed in possession of the premises and a new contract for the completion of the four hulls which Marine had begun was given to East Coast. Although East Coast, in April of 1943, also received the contract for the twelve additional vessels, the arrangements made by it with the government, as disclosed by the Interim Report, were at all times materially different from those which had prevailed between the government and Marine, much to the misfortune of taxpayers generally.

At the time of the transition, it appears that Ferend, the disfavored president of Marine, had called together the heads of

---

[2] Introduced and received in evidence without objection was House Report No. 2075, 78th Cong. 2nd Sess., December 15, 1944, an Interim Report of the Investigation of East Coast from the Committee on the Merchant Marine and Fisheries. Both parties have drawn heavily upon this document to set the background of the case *sub judice*.

[3] See United States v. Michener, 3 Cir., 1945, 152 F.2d 880.

[4] All the stock of Marine was owned by Sword Line, Inc., and one Ferend was president of both. Under the arrangement, Ferend deposited all the Marine stock with Marine's bank; a revolving fund was created with funds supplied by the bank with provision for deposit of additional funds by War Shipping Administration on account of work previously completed by Marine.

Marine's various departments and requested that they continue for East Coast. But East Coast brought its own corporate officials, and eventually also replaced practically all of Marine's departmental heads. McCartney, who was Marine's labor relations manager and purchasing agent, was about to complete a collective bargaining agreement when the change occurred. He testified that he continued as East Coast's labor relations manager, and negotiations on the labor agreement were begun anew. It may be assumed that the production employees of Marine, or most of them, continued with East Coast;[5] the petitioner did, as did another nurse, Miss Milligan, who had been hired at the same time.

Thenceforth, Marine was inactive and in a moribund condition, its business contracts terminated and its property appropriated, for in May of 1943, the condemnation petition was amended to provide for the taking of the fee. East Coast, on the other hand, was an entirely new concern, without any affiliation whatsoever with Marine, Marine's sole stockholder, or Ferend. Plainly it did not assume any of Marine's obligations or receive or become entitled to receive any of the funds or profits due Marine: all of those accompanied Marine to its judicial sanctuary under the bankruptcy laws. Further, East Coast obviously did not enter the premises as a result of any arrangement with Marine, nor was it organized by the Maritime Commission. In fact, it came about as a result of negotiations begun in January, 1943, before Marine was ousted, by one Otterson to steer the contract for the twelve Commission vessels to another concern. On the failure of those negotiations Otterson proposed to the Commission the organization by him of a new company to receive the contract and suggested that the company be installed in Marine's yard. The successful launching of East Coast, therefore, hinged upon the Commission's willingness to furnish it with a locus operandi.

In March, 1945, East Coast, according to McCartney, finished its construction program and vacated the premises. There is only an intimation in the record that it still exists in a corporate capacity. In any event, while it does not affirmatively appear what happened in the condemnation proceedings, the shipyard came into the possession of the Trustee of Marine.[6]

In that same month, Sword Line capital procured the formation of the respondent with Ferend as its president.[7] Ferend, in his capacity as president of Sword Line, wrote to the Trustee of Marine offering to lease the Bayonne shipyard in the name of the respondent. The lease was arranged, and the approval of the court was given on April 13, 1945.

Pursuant to the lease, the respondent was to have the use of the shipyard from month to month with the right in either party to terminate on three months' written notice. Further, it was obligated to pay to the Trustee as minimum monthly rent the aggregate of: one/twelfth of the taxes assessed upon the property by the City of Bayonne; one/twelfth of the mortgage interest; and one/twelfth of the insurance premiums. However, in the event that the monthly rent to be paid by the United States for its use was fixed at an amount in excess of the minimum rent payable by the respondent, the latter was bound to make up the difference. The respondent was also given the right "to operate the within premises and use the properties herein described for the purposes of conducting a shipyard therein or any other business." The respondent agreed to pay for its own water, gas, steam and electricity, and not to distribute dividends to its stockholders until the rent was paid. Lastly, the jurisdiction of the bankruptcy court was retained, and summary right of eviction was vested in the Trustee upon any failure on the part of the respondent to meet the conditions imposed.

---

[5] Bayonne not being a very large city, there is testimony that production employees, by and large, would be the same men.

[6] By March, 1945, nothing had been paid to the Trustee by the government for the use of the yard or as a deposit on the value of the fee.

[7] At the time of the trouble with Marine, Sword Line's general agency agreement with the government was terminated, but later reinstated.

The respondent made no arrangement with East Coast, and it did not assume, in any manner of speaking, that company's obligations, contracts, or work. Those, together with the profits of its operation went with East Coast. When the respondent went into possession, it took the bare yard; production had ceased entirely. Between the time the respondent took over, and about May 25, 1945, the respondent had approximately twenty-five employees as guards, maintenance men, and office workers. It was not until June, 1945, that it required the services of a nurse, and in that month McCartney, who was made acting general manager, but later purchasing agent, employed Miss Milligan, giving due consideration to the fact that she had worked on the premises before, was head nurse, and knew her work. Although many, if not most, of the production men who had worked for Marine and East Coast were hired by the respondent, a new contract was negotiated with the employees' bargaining agent, the same union with which East Coast had dealt, and no claim was ever made on the basis of seniority for those men.

■ It is obvious that had matters remained as they were on April 19, 1943, East Coast would bear the brunt of the Act, for the petitioner left its employ. Under the circumstances set forth, the accession of the respondent to the possession of the shipyard and the operation of that property for the purposes for which it is essentially adapted should not, in our view, be considered synonymous with a taking over of the "property, equipment and business" of its predecessor in occupation. The more so when the affirmative evidence disproves any inference of connection and reveals a complete cessation of that predecessor's function at the particular location involved. We conclude, therefore, that the evidence as related fails to support the finding of that continuity or privity between the two which would project East Coast's duty toward the petitioner directly forward onto the shoulders of the respondent.

To the learned trial judge, the lease executed by the respondent and the Trustee of Marine was decisive. However, it is patent that East Coast did not assume Marine's business; rather, as a new and independent corporation, it obtained the business that might have gone to Marine, had it not misbehaved, wholly through its independent efforts and because of the negotiations of its promoter, Otterson, with the Maritime Commission. In any event, by March, 1945, Marine was not so resuscitated, and nothing had happened as between it and East Coast to justify the shifting of East Coast's obligations to Marine or its Trustee so that, as by contagion, the respondent would acquire East Coast's infirmities.

Moreover, we do not agree that the lease between the respondent and the Trustee was not at arm's length merely because Sword Line capital is the former's supporting prop. Marine was inactive and in the exclusive control of the bankruptcy court. The assumption we make is that the approval by the bankruptcy court carries with it the inference that the lease would inure to the benefit of the estate and its creditors.[8] The rent which the respondent contracted for is, in essence, the equivalent of "just compensation", for that is the obligation of the United States to Marine: Monongahela Navigation Co. v. United States, 1893, 148 U.S. 312, 13 S.Ct. 622, 37 L. Ed. 463.

Similarly, we do not agree that the lease amounts to only a "working agreement" and lacks the qualities of a "strict lessee and lessor arrangement". In our judgment, the terms therein are peculiarly adapted to the uncertainties in Marine's position stemming from the claims by and

---

8 From Sword Line's letter to the Trustee, it appears that the Trustee had a claim against the United States for $249,393.19, and a claim against Sword Line for $243,207.91. Ferend had a claim against the Debtor for $221,800, but subordinated it to the claims of other unsecured creditors. The principal secured creditor was Marine's banking house. It also appears in the record that Sword Line agreed to subordinate any claims acquired or to be acquired by it by purchase of claims against the Debtor in favor of other unsecured creditors.

against the United States, the pending condemnation proceedings, and the pending Chapter X proceedings. The respondent did more than promise to pay the overhead expenses of the shipyard. And the Trustee under the lease, is not to share or receive, in any manner, the profits of the respondent from its operations; likewise the duty to pay rent, as well as the amount of the rent, is totally divorced from the respondent's earnings: the absence of such provisions would seem to us to embarrass the conclusion that the lease is a mere "working agreement".

The duty created by the controlling statute expressly falls solely upon the employer in whose employ the veteran was at the time he entered the service. In this case, that employer is East Coast. We do not challenge the logic which extends the impact of that law in an appropriate situation.[9] But we think that we do not have here such reorganization, absorption, merger, consolidation, or other manifestation of corporate or business continuity as should impose upon the respondent the duty that inevitably devolves upon East Coast. That the nature of the business of the corporation was the same, and that they occupied the same premises successively do not, without more, operate to alter their independent character, nor impose upon one the liabilities under the Act of the other. Indeed, the petitioner does not go so far as to contend that she is entitled to the same counter in the same store, merely because they happen to be in existence upon her return, without regard to the present occupancy of the store, or how the occupant got there.

Our conclusion, therefore, is that the evidence fails to support the finding of the court below, and that the petitioner, never having been in the employ of the respondent, nor having left its employ to enter the service, is not entitled to relief in this action. Accordingly, the judgment of the court below will be reversed and the cause remanded with directions to enter judgment for the respondent.

---

[9] A change in stock ownership of the corporate entity while the petitioner was in the service did not warrant refusal to reemploy. Doane Co. v. Martin, 1 Cir., 1947, 164 F.2d 537. Likewise, the continuation of a partnership business in the form of a corporation. See Brown v. Luster, 9 Cir., 1947, 165 F.2d 181.

In Tannenbaum v. Ballentine & Sons, Civil Action No. 9207, decided in the District of New Jersey, February 6, 1947, the respondent admitted the petitioner's allegation that "* * * said Christian Feigenspan Brewing Company was absorbed by the respondent, and the respondent purchased and assumed operation of the property, equipment, and business of the said Christian Feigenspan Brewing Company, and thereupon succeeded to the business of the said Christian Feigenspan Brewing Company." We affirmed the decision of the court below in favor of the petitioner over the assertion that the circumstances had changed: 161 F.2d 1023 (1947) (per curiam).