**Pamela F. REYNOLDS, Plaintiff,**

v.

**REHABCARE GROUP EAST INC., Defendant.**

No. 4:07–CV–00388.

United States District Court,
S.D. Iowa,
Central Division.

Jan. 29, 2008.

Thomas S. Reavely, Whitfield & Eddy, PLC, Des Moines, IA, for Plaintiff.

Scott M. Brennan, Davis Brown Koehn Shors & Roberts, Des Moines, IA, George Richard Wood, Littler Mendelson PC, Minneapolis, MN, for Defendant.

## ORDER

ROBERT W. PRATT, Chief Judge.

Pamela Reynolds ("Plaintiff") filed the present action against RehabCare Group East Inc. ("Defendant" or "RehabCare") on August 29, 2007 (Clerk's No. 1), alleging that Defendant violated the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4301–33. Before the Court is Plaintiff's Motion for Preliminary Injunction, filed October 4, 2007. Clerk's No. 13. Consistent with the parties' stipulation to extend the time for Defendant to respond to the motion (*see* Clerk's No. 16), Defendant filed a resistance (Clerk's No. 25) on January 2, 2008, and Plaintiff filed a reply (Clerk's No. 26) on January 9, 2008. A hearing was held on January 10, 2008. The matter is fully submitted.

## I. FACTUAL BACKGROUND

Plaintiff is a licensed physical therapist in the State of Iowa. At some point in 2002,[1] she began providing physical therapy services at the Green Hills Retirement Community ("Green Hills") in Ames, Iowa,

---

1. Plaintiff's Complaint alleges that she began working at the Green Hills Retirement Community in 2004. *See* Compl. ¶ 7. While testifying at the hearing on the present motion,

as part of her employment with a company called MJ Care. In May 2005, MJ Care ceased providing services to Green Hills. Soon thereafter, Progressive Rehab Associates ("Progressive"), a company based in the Iowa City/Coralville area, began providing physical therapy services at Green Hills. Plaintiff continued her employment as a physical therapist with Progressive, providing essentially the same services at Green Hills as she provided while employed by MJ Care.[2]

On November 9, 2005, Plaintiff, a Captain in the United States Army Reserve, received a telephone call informing her that she was going to receive mobilization orders calling her to active duty. Plaintiff immediately called Progressive to inform her employer of the news. Plaintiff reported to active duty on March 26, 2006 at Ford Hood, Texas. Between receiving notification in November 2005 and her actual deployment in March 2006, Plaintiff communicated frequently with Progressive and with Rod Copple ("Copple"), the administrator of Green Hills, about how staffing problems at Green Hills would be handled while she was gone. Plaintiff was on active duty at Fort Hood from March 26, 2006 until July 8, 2007, at which time she was discharged back into the Army Reserve. At the time of her deployment, Plaintiff was receiving $51.28 per hour as an employee of Progressive. She worked 30 hours per week, had three weeks of annual vacation, and was allowed to participate in the Progressive's 401 K program.

During Plaintiff's active military service, she remained in relatively close contact with Progressive, Copple, and many residents and service providers of Green Hills. Plaintiff was aware by February 2007 that Copple was interested in turning Green Hills into a "skilled nursing facility" ("SNF") under Medicare. Through communications with Joe Albright, the business administrator of Progressive, Plaintiff became aware that Progressive was concerned about being able to properly staff Green Hills, particularly if it were to become an SNF. At some point in time, Progressive determined that it would terminate its contract with Green Hills effective June 30, 2007.

In an effort to find a vendor to provide rehabilitation services at Green Hills, Copple began discussions with RehabCare in approximately February 2007. Copple and Plaintiff both wanted Plaintiff to continue her work at Green Hills after her release from active duty, so Plaintiff was very involved in Green Hills' efforts to find a provider to replace Progressive. In June 2007, while still deployed, Plaintiff spoke with Melissa Violette ("Violette"), the regional manager of operations for RehabCare. Violette indicated that RehabCare was aware of Copple's desire to have Plaintiff return to Green Hills, and that RehabCare was interested in discussing the matter with Plaintiff. During subsequent conversations with Violette, Plaintiff indicated that she would like to be paid $65 per hour for a "PRN"[3] position with Re-

---

however, Plaintiff stated that she worked for MJ Care, providing services at Green Hills, from the spring of 2002 until May 2004.

**2.** It is unclear whether Progressive began providing services in May of 2004 or in May of 2005. Plaintiff's testimony at hearing referenced 2004, while Defendant's factual recitation references 2005.

**3.** In a PRN position, Plaintiff would provide physical therapy services on an "as needed"

basis. Plaintiff testified that she requested $65 per hour because PRN positions do not get benefits and because she had been told that "if you don't receive any benefits, that [30% should be added] on to your basic pay." Hr'g Tr. at 37 (all references throughout this order to the Hearing Transcript refer to the Court's unedited RealTime transcript). Thus, in Plaintiff's mind, $65 per hour in a PRN position would be approximately equivalent to her previous rate of pay with benefits.

habCare. Plaintiff also told Violette about USERRA and about Plaintiff's contention that she was entitled to reemployment. Violette told Plaintiff that she would provide the information to her supervisors, as RehabCare had a policy of not making employment offers until such time as it actually had a contract with a specific retirement home in place.

After their conversations, Violette sent Plaintiff an application for employment with RehabCare. Plaintiff filled out the application on July 11, 2007, making substantial changes to the form of the application. *See* Ex. 16. Specifically, Plaintiff crossed out the word "employment" in the heading, "Application for Employment," and hand-wrote "Re–Employment/USER-RA" in its place. Plaintiff further wrote: "I am an employee of Progressive Rehab Associates returning from 16 months of Active Duty with the United States Army. I am seeking re-employment as physical therapist at Green Hills Retirement Community." *Id.* Plaintiff further crossed out the "Applicant Statement," certifying that the information in the application was true and acknowledging that employment would be at-will, and wrote "Not applicable—See USERRA." *Id.*

On July 26, 2007, Green Hills entered into a contract with Deerfield Retirement Community in Des Moines, Iowa, wherein Deerfield agreed to provide rehabilitation services to Green Hills. Deerfield subcontracted with RehabCare, such that Rehab-Care assumed Deerfield's obligations to provide physical therapy, occupational therapy, and speech therapy at Green Hills. Violette asked Plaintiff to meet her at Green Hills on July 27, 2007, the first day that RehabCare was to be present at Green Hills. Plaintiff met with Violette for approximately an hour or an hour and one-half, during which time they reviewed patient records and Plaintiff gave Violette a tour of the building. Plaintiff also introduced Violette and another RehabCare employee to various Green Hills staff. Following the tour, Plaintiff and Violette spoke privately. Violette told Plaintiff that RehabCare really wanted to bring Plaintiff on as an employee, but that Re-habCare did not think that USERRA applied to it because RehabCare did not purchase any of Progressive's assets. Plaintiff responded that she believed that USERRA did apply and that her lawyer would contact RehabCare's lawyer. Violette did tell Plaintiff that RehabCare had offers of employment for Plaintiff to employ her as a physical therapist at Green Hills, but Plaintiff refused to hear the offers, maintaining that "if they are not going to honor the USERRA law and reinstate me into my job that I had prior to leaving, I didn't want to hear the offer." [4] Since that time, Plaintiff has not had any further personal communication with Re-habCare and has not worked for Rehab-Care in any capacity.

Plaintiff is presently employed approximately 12–15 hours per week with Rehab Choice, at the rate of $40 per hour, plus travel time and mileage. Plaintiff also works for Orthopedic Neurological Rehabilitation for up to five hours per week at the rate of $50 per hour. Plaintiff, however, maintains that USERRA obligates Re-habCare to reemploy her in the position she previously held, that is, as a physical therapist at Green Hills, under salary and hour conditions equivalent to those in which Progressive employed her prior to her deployment.

---

**4.** The offers of employment were subsequently relayed to Plaintiff through attorneys. The offers were for a full-time position at $35 per hour, a part-time position at $40 per hour, and a PRN position at $45 per hour. Hr'g Tr. at 80.

## II. LAW AND ANALYSIS

■ Plaintiff requests that the Court issue a preliminary injunction, ordering RehabCare to reinstate Plaintiff to her position as a physical therapist at Green Hills with seniority, status and pay equivalent to that she received from Progressive prior to her deployment, and enjoining RehabCare from retaliating against Plaintiff. The purpose of issuing a preliminary injunction in a lawsuit is to preserve the status quo and to prevent irreparable harm until the parties have a chance to conduct discovery and the court has an opportunity to hold more extensive hearings on the lawsuit's merits. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters,* 415 U.S. 423, 439, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974); *Devose v. Herrington,* 42 F.3d 470, 471 (8th Cir.1994). Federal Rule of Civil Procedure 65 authorizes the court to enter a preliminary injunction where appropriate. *See* Fed.R.Civ.P. 65(a). It is well established that a party is entitled to equitable relief only if there is no adequate remedy at law. *Taylor Corp. v. Seasons Greetings, LLC,* 403 F.3d 958, 967 (8th Cir.2005).

■ The burden of establishing the propriety of a preliminary injunction is on the movant. *See Baker Elec. Coop., Inc. v. Chaske,* 28 F.3d 1466, 1472 (8th Cir.1994) (citing *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.,* 871 F.2d 734, 737 (8th Cir.1989) (en banc)). A preliminary injunction is an extraordinary form of relief and must be carefully considered. *See Calvin Klein Cosmetics, Corp. v. Parfums de Coeur, Ltd.,* 824 F.2d 665, 667 (8th Cir.1987). This Court believes that the power to grant a preliminary injunction is an awesome power vested in the district court, as it expedites the trial process and forces discovery to be completed within a limited time frame.

■ In this Circuit, the four-part test enunciated in *Dataphase Systems, Inc. v.* *C L Systems, Inc.,* 640 F.2d 109 (8th Cir. 1981) (en banc), is applied to determine if preliminary injunctive relief is appropriate. The test set forth in *Dataphase* involves examining four factors: (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties and litigants; and (4) the public interest. 640 F.2d at 113. The Eighth Circuit has determined that no single factor is dispositive; all factors must be considered and balanced to determine whether to grant a preliminary injunction. *See Int'l Ass'n of Machinists and Aerospace Workers v. Schimmel,* 128 F.3d 689, 692 (8th Cir.1997). Accordingly, this Court will consider each of the four factors in turn.

### A. Probability of Success on the Merits

■ The first factor the Court must consider in deciding whether to issue a preliminary injunction is the likelihood that Plaintiff will succeed on the merits. In considering this factor, the Court need not decide whether Plaintiff, as the moving party, will ultimately succeed on her claims. *Am. Express Fin. Advisors, Inc. v. Yantis,* 358 F.Supp.2d 818, 826 (N.D.Iowa 2005) (citing *Glenwood Bridge, Inc. v. Minneapolis,* 940 F.2d 367, 371 (8th Cir.1991)). Rather, Plaintiff's success on the merits must be "at least ... sufficiently likely to support the kind of relief [Plaintiff] request[s]." *Id.* (quoting *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.,* 997 F.2d 484, 488 (8th Cir. 1993)).

Amongst other things, Congress enacted USERRA for the express purpose of "minimiz[ing] the disruption to the lives of persons performing service in the uniformed services as well as to their employers, their fellow employees, and their communities, by providing for the prompt reem-

ployment of such persons upon their completion of such service." 38 U.S.C. § 4301(a)(2). In furtherance of this purpose, section 4312 provides that: "[A]ny person whose absence from a position of employment is necessitated by reason of service in the uniformed services shall be entitled to the reemployment rights and benefits and other employment benefits of this chapter" if the person: (1) gave advance notice of their service to their employer; (2) was absent for service in the uniformed services for a period not exceeding five years; and (3) reports to or submits an application for reemployment within 90 days after the completion of uniformed service. Section 4313 provides that a person eligible for reemployment under USERRA "shall be promptly reemployed ... in the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, or a position of like seniority, status and pay, the duties of which the person is qualified to perform." 38 U.S.C. § 4313(a)(2)(A).

Neither party disputes that Plaintiff met all of the requirements to be eligible for reemployment under USERRA. Rather, the fighting issue in this case is whether Plaintiff has a right to reemployment by RehabCare, given that she was employed by Progressive at the time of her deployment to active military service. The inquiry turns on the question of whether RehabCare is a successor in interest to Progressive, because USERRA specifically provides that an "employer," for purposes of the Act, means "any person, institution, organization, or other entity that pays salary or wages for work performed or that has control over em-

ployment opportunities, including ... *any successor in interest* to a person, institution, organization, or other entity referred to in this subparagraph." 38 U.S.C. § 4303(4)(A)(iv) (emphasis added). USERRA does not, itself, define the term "successor in interest." The applicable Department of Labor Regulations, however, provide the following:

**Is a successor in interest an employer covered by USERRA?**

USERRA's definition of "employer" includes a successor in interest. In general, an employer is a successor in interest where there is a substantial continuity in operations, facilities, and workforce from the former employer. The determination whether an employer is a successor in interest must be made on a case-by-case basis using a multi-factor test that considers the following:

(a) Whether there has been a substantial continuity of business operations from the former to the current employer;

(b) Whether the current employer uses the same or similar facilities, machinery, equipment, and methods of production;

(a) Whether there has been a substantial *continuity of employees;*

(c) Whether there is a similarity of jobs and working conditions;

(e) Whether there is a similarity of supervisors or managers; and,

(f) Whether there is a similarity of products or services.

20 C.F.R. § 1002.35. A nearly identical test for successor liability was employed by the Eighth Circuit Court of Appeals in *Leib v. Georgia–Pacific Corp.,* a case arising under a USERRA predecessor, the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. §§ 2021 et seq.[5]

---

**5.** The *Leib* test puts forth seven factors for consideration of whether one entity is a successor in interest to another, while the Department of Labor Regulation puts forth only

six factors. Two of the *Leib* factors, however, "use of the same plant" and "similarity of jobs and working conditions," are combined

*Leib,* 925 F.2d 240, 247 (8th Cir.1991) (adopting a test for successor liability that includes consideration of circumstances such as "whether there is (1) substantial continuity of the same business operations, (2) use of the same plant, (3) continuity of work force, (4) similarity of jobs and working conditions, (5) similarity of supervisory personnel, (6) similarity in machinery, equipment, and production methods, and (7) similarity of products or services.") (citing *Smegal v. Gateway Foods of Minneapolis, Inc.,* 819 F.2d 191, 193 (8th Cir. 1987)). Indeed, the legislative history of USERRA states: "The Committee intends that the multi-factor analysis utilized by the court in *Leib v. Georgia–Pacific Corp.* is to be the model for successor in interest issues, except that the successor's notice or awareness of a reemployment rights claim at the time of merger or acquisition should not be a factor in this analysis." H.R.Rep. No. 103–65, *reprinted in* 1994 U.S.C.C.A.N. 2449 at 2454.

It appears that only two cases have considered the precise question now before the Court, *Coffman v. Chugach Support Services, Inc.,* 411 F.3d 1231, 1232 (11th Cir.2005), and *Murphree v. Communications Technologies, Inc.,* 460 F.Supp.2d 702, 704 (E.D.La.2006). In *Coffman,* a case cited by Defendant, the Unites States Air Force awarded a contract to provide support services at Tyndall Air Force Base to Del–Jen, Inc. *Coffman,* 411 F.3d at 1232. Del–Jen hired Charles Coffman in October 1997 as a Hazardous Materials Specialist, and Coffman was eventually promoted to the position of Hazardous Materials Program Manager. *Id.* In November 2001, Coffman was ordered to active duty with the Air Force. *Id.* He notified Del–Jen of his deployment, and Del–Jen hired Rhonda Cruz as a temporary replacement during Coffman's absence. *Id.*

On October 1, 2002, while Coffman was still on active duty, the Air Force awarded the support services contract at Tyndall to Chugach. *Id.* at 1233. Chugach interviewed Coffman, but apparently for a non-management union position. *Id.* Chugach eventually hired Cruz as the Environmental Hazardous Materials Specialist, Chugach's equivalent to Coffman's former position. Indeed, Chugach hired 97 of 100 former Del–Jen employees. Coffman was one of only three Del–Jen employees who was not hired in the transition, and he was the only employee not hired that was on military leave at the time of the transition from Del–Jen to Chugach. *Id.* Coffman subsequently took a position with Del–Jen as a Vehicle Control Coordinator at Tyndall, but was unsatisfied. *Id.* at 1234. He wrote a letter to Chugach's president, asserting his reemployment rights under USERRA. *Id.* Chugach denied Coffman's request, taking the position that Del–Jen's decision to hire Coffman back in a position of comparable pay and status satisfied USERRA's requirements. *Id.*

In addressing Coffman's claim under USERRA, the district court found that Chugach was not Del–Jen's successor in interest, and thus owed Coffman no reemployment obligation. *Id.* In reaching this conclusion, the district court applied an "ownership and control" test, rather than the "business continuity test" employed in *Leib. Id.* at 1237. The Eleventh Circuit Court of Appeals affirmed the district court's finding that Chugach was not Del–Jen's successor in interest, concluding:

> While we agree with Coffman that a determination of successor liability under USERRA requires an analysis un-

---

in the second factor of the Department of Labor regulation, which asks "[w]hether the current employer uses the same or similar facilities, machinery, equipment, and methods of production." *Compare Leib,* 925 F.2d at 247 *with* 20 C.F.R. § 1002.35.

der the *Leib* factors as stated by Congress, such an analysis is unnecessary and improper when no merger or transfer of assets even transpired between the two subject companies. Generally, one of the fundamental requirements for consideration of the imposition of successor liability is a merger or transfer of assets between the predecessor and successor companies. *See Kicinski v. Constable Hook Shipyard,* 168 F.2d 404, 408–09 (3d Cir.1948) (holding that because there was no predecessor-successor relationship, defendant corporation was under no duty to reemploy nurse returning from military service who had worked for alleged predecessor company). In the present case, indisputably, there was no merger or transfer of assets between Del–Jen and Chugach.

*Id.* at 1237.

Defendant urges the Court to adopt the position of *Coffman* and find that, because there was no merger or transfer of assets between Progressive and RehabCare, there is no predecessor-successor relationship, and thus, RehabCare cannot be deemed Progressive's successor in interest. Plaintiff, on the other hand, urges the Court to adopt the reasoning of *Murphree v. Communications Technologies, Inc.,* which explicitly rejects *Coffman's* use of an "ownership and control test."

In *Murphree,* Major Thomas Murphree was hired in March 2000 by a military support contractor, MPRI, Inc., to serve in one of two positions at Tulane University as an Assistant Professor of Military Science ("APMS"). *Murphree,* 460 F.Supp.2d at 704. On November 15, 2001, MPRI's contract, which was up for re-bid, was awarded to COMTek, which was to assume the contract from MPRI about six months later. *Id.* On November 24, 2001, Major Murphree was ordered to active duty with the Army. *Id.* While deployed, MPRI filled Major Murphree's position at Tulane by making a permanent offer of employment to another individual, Michael Kazmierzak. Additionally, the Army office in charge of overseeing the staffing of APMS positions nationwide moved one of the two Tulane APMS positions to Jacksonville State University in Alabama, leaving the single remaining APMS position at Tulane occupied by Kazmierzak. Kazmierzak was rehired by COMTek when COMTek assumed MPRI's contract on April 1, 2002. *Id.*

When Major Murphree sought reemployment under USERRA, COMTek informed him that one of the APMS positions at Tulane had been reallocated to Jacksonville State University and that the other APMS position was occupied. *Id.* COMTek invited Major Murphree to apply for any APMS position in the nation, but emphasized its position that it owed Major Murphree no reemployment obligation because Major Murphree had been an employee of MPRI, not of COMTek. *Id.* Eventually, COMTek offered Major Murphree the APMS position at Jacksonville State University, but Major Murphree declined the offer because he viewed the position as inferior to his previous position at Tulane, and because he did not wish to relocate his family. *Id.* Despite a finding by the Department of Labor's Veterans Employment and Training Service that COMTek was a successor in interest to MPRI, COMTek refused to rehire Major Murphree as an APMS at Tulane. *Id.* Major Murphree sued for, amongst other things, violation of USERRA.

█ In evaluating Murphree's claim, the district court acknowledged the ownership and control test employed by the *Coffman* court, but found that precedent indicated that the Fifth Circuit would adopt the *Leib* test, "which do[es] not include any merger or transfer requirement." *Id.* at 707. The Murphree court also noted that the Department of Labor Regulations at 20

C.F.R. § 1002.35 "essentially adopt the *Leib* factors and do not include a merger or transfer of assets as a factor to consider." *Id.* Notably, the *Coffman* court did not have 20 C.F.R. § 1002.35 available for reference, as that particular regulation did not become effective until January 18, 2006, approximately six months after the *Coffman* decision was rendered. Given the lack of case law, it is unclear whether the Eleventh Circuit would reconsider its requirement that there be a merger or transfer of assets prior to consideration of the *Leib* factors, given the Department of Labor regulations. Regardless, this Court adopts the reasoning of the *Murphree* court with regard to the question of whether a merger or transfer of assets is a necessary prerequisite to a finding of successor liability and finds that no such requirement is warranted either under either *Leib* or the Department of Labor regulation. Indeed, when the Eighth Circuit adopted the business continuity test in *Leib*, it acknowledged that the business continuity test is "most consistent with the policies underlying the veterans' reemployment statute" and that an "ownership control test" could permit a " 'simple paper transaction' to rob returning veterans of the reemployment benefits Congress sought to guarantee." *Leib*, 925 F.2d at 245. Accordingly, the Court will evaluate each of the six Department of Regulation factors to determine whether RehabCare is a successor in interest to Progressive.

In general support of her position that RehabCare is a successor in interest to Progressive, Plaintiff presented the following testimony on direct examination. Plaintiff testified that her job duties at Green Hills were to provide evaluations and treatment to the residents of Green Hills, as well as to people in the community who sought outpatient services at Green Hills. Hr'g Tr. at 10. Plaintiff provided these services in the exercise room on the Green Hills campus. *Id.* at 19. In the exercise room were three treadmills, a stair climber machine, two recumbent bikes, three pulley machines for weights, a high-low bar for weights, two mat tables and treatment tables, and various weights and equipment. *Id.* at 19–20. Plaintiff described the equipment in the exercise room as standard equipment that would be present in any physical therapy location. *Id.* at 20.

Plaintiff further testified that while working at the Green Hills campus, she worked with Dr. George Montgomery, the medical director, Lynn Mitchell, the director of nursing, and two activities directors, Stacy Schultz and Sheryl (last name unknown). *Id.* at 22. While working at Green Hills, Plaintiff testified that her Progressive supervisors were Joe Albright and Drew Bossum, though those individuals were rarely present at Green Hills. At Green Hills itself, Plaintiff testified that doctors, nurses, and the facility administrator could all report her if she was doing her job incorrectly. *Id.* at 23.

When Plaintiff met Melissa Violette at Green Hills on July 27, 2007, Plaintiff noted that the exercise room looked fundamentally the same. *Id.* at 43. Plaintiff also looked at patient charts left by Progressive, and noticed that many were the same patients that she had treated prior to her deployment. *Id.* at 44. In personal visits that Plaintiff has made to the facility since July 27, 2007, Plaintiff has observed that the exercise room used by RehabCare is the same room as was used by Progressive; the equipment is the same or similar to that used by Progressive; George Montgomery is still the physician at Green Hills; Lynn Mitchell is still the director of nursing; the activities directors, Stacy and Sheryl are the same; other staff, such as Copple and the nutritionist, are the same; and many residents of the facility are the same. *Id.* at 49–51.

1. *Whether there has been a substantial continuity of business operations from the former to the current employer.*

■ Plaintiff argues that Copple, the administrator of Green Hills, contracted with RehabCare for precisely the same services previously provided by Progressive, that is, for physical therapy and other types of rehabilitation services. Defendant counters that RehabCare did not continue Progressive's business operations, but rather started its own operations with its own personnel, patient files, and equipment.

The Court finds that this factor weighs against a finding that RehabCare is a successor in interest to Progressive. On cross-examination, Plaintiff admitted several important facts. Plaintiff has never been employed by either RehabCare or by Green Hills. Progressive no longer has any relationship with Green Hills, never owned any portion of Green Hills, never bought any equipment for Green Hills, and the only relationship between Progressive and Green Hills was the one stemming from the contract between those entities. *Id.* at 57–58. Progressive and RehabCare are completely separate entities, and neither has any interest, contract, or relationship with the other. *Id.* at 58. RehabCare did not "take over" or "assume" Progressive's contract, but rather entered into an entirely new contract. *Id.* Indeed, RehabCare's contract is actually with Deerfield, which is the entity that actually contracted with Green Hills to provide therapy services on the Green Hills campus. RehabCare has its own business operations at Green Hills that are entirely separate and distinct form the operations that Progressive had. *Id.* at 61–62. Progressive and RehabCare each have their own set of policies and procedures on how things are to be done, how employee disputes are handled, etc.,

though some aspects of the two companies are similar due to ethical and legal rules governing the physical therapy profession. *Id.* at 63. Progressive removed its patient charts from the facility after its contract ended, though some information remained in "hard charts," consistent with legal and ethical requirements. *Id.* at 94. Melissa Violette further testified that, despite having some patient chart information available from Progressive, RehabCare independently assessed all of the Green Hills patients for services to be provided and began utilizing its own forms. *Id.* at 128.

On the evidence available to the Court, there does not appear to be any continuity of operations between Progressive and RehabCare. The only significant factors tying the two entities together are that both provide rehabilitation services and that both provided some of those services at Green Hills. The Court cannot say that this mere similarity in business operations is sufficient to find any continuity of business operations between the two entities, let alone *substantial* continuity of business operations.

2. *Whether the current employer uses the same or similar facilities, machinery, equipment, and methods of production.*

■ Plaintiff argues that RehabCare simply picked up where Progressive left off. More specifically, Plaintiff urges that RehabCare employees use the same facilities for their work at Green Hills and use the same equipment for doing that work. Further, Plaintiff points out that while individual therapists may differ in their approach to providing rehabilitation services, the basic therapies offered by Progressive and RehabCare are the same.

The Court agrees that Progressive and RehabCare provide fundamentally the same services, that is, occupation, speech,

and physical therapy rehabilitation. The Court also agrees that these services were provided in the same location and in generally the same way by both Progressive and RehabCare. Plaintiff admits, however, that the equipment used for physical therapy would be essentially the same at any facility providing physical therapy services. Indeed, while the *type* of equipment used by Progressive is the same as that used by RehabCare, the fact remains that RehabCare did not buy any of the equipment that Progressive kept on-site at Green Hills. *Id.* at 61. Nor did RehabCare buy any of the supplies that Progressive used at Green Hills. *Id.* Indeed, much of the equipment in the exercise room belongs to Green Hills itself, and any equipment that did belong to Progressive was removed after Progressive's contract with Green Hills ended. *Id.* at 66. Copple confirmed that no equipment owned by Progressive remains on the Green Hills campus. *Id.* at 142–43. Given these factors, the Court cannot say that this element of consideration weighs in favor of one side or the other.

3. *Whether there has been a substantial continuity of employees.*

■ Plaintiff emphasizes that the fact that no Progressive employees currently work for RehabCare ignores the context of patient care at Green Hills. Indeed, Plaintiff asserts that, rather than evaluating the small number of Progressive or RehabCare employees at Green Hills, the Court should look at the entire Green Hills environment, including "the dozens of Green Hills' employees that contribute to the interdisciplinary patient care teams . . . and other employees that, at any given time, work with a physical therapist to render care." Pl.'s Reply Br. at 4.

Plaintiff offers absolutely no support for the proposition that this Court should evaluate continuity of employees by looking at whether the employees at Green Hills were the same during the contracts of Progressive and RehabCare. The question before the Court is whether Plaintiff is entitled to be reemployed by *RehabCare* on the basis that RehabCare is a successor in interest to *Progressive*, not whether Plaintiff is entitled to be reemployed by Green Hills. The fact that Progressive and RehabCare each provided services on the Green Hills campus does not change the fundamental fact that Plaintiff *was never employed by Green Hills*. Were this Court to adopt Plaintiff's position, successor interest liability under USERRA would be broadened beyond all logical bounds.[6]

Given that Plaintiff worked for Progressive, and not for Green Hills, the Court finds that this factor weighs decidedly in favor of Defendant. While one employee of RehabCare worked for Progressive at some point in time, Plaintiff admitted on cross-examination that RehabCare did not hire any Progressive employees, and that the one employee who worked for both companies had nothing to do with RehabCare providing services at Green Hills. Hr'g Tr. at 60. Thus, there is no substantial continuity of employees between Progressive and RehabCare.

4. *Whether there is a similarity of supervisors or managers.*

■ As with the question of whether employees are the same between Progressive and RehabCare, Plaintiff posits that the Court should evaluate the entire context of the working environment at Green Hills. Specifically, Plaintiff points out that

---

**6.** For example, a Burger King opening in the location where a McDonald's previously existed could be required to "rehire" a Mc-

Donald's worker under USERRA simply because the food suppliers, customers, and contract cleaning crews are the same.

any therapist, whether an employee of Progressive or RehabCare, would have been supervised and managed by Rod Copple and by the Green Hills Board of Directors.

For the same reasons that the Court rejected Plaintiff's argument regarding continuity of employees, the Court finds that Plaintiff's argument regarding whether there is a similarity between supervisors and managers must fail. Plaintiff testified that her supervisors at Progressive, Joe Albright and Drew Bossum, were no longer supervising anyone at Green Hills, and that RehabCare had its own supervisors and managers, none of whom ever worked for Progressive. *Id.* at 62. Though Plaintiff indicated that she had some supervision at Green Hills by Rod Copple, Dr. Montgomery, nursing staff, etc., she further admitted that not one of those people had the right to hire her, fire her, or indeed take any action worse than insisting to Progressive that she not be allowed to provide services at Green Hills.[7] *Id.* at 92. Accordingly, the Court finds that this factor weighs in favor of Defendant and against a finding that RehabCare is a successor in interest to Progressive.

5. *Whether there is a similarity of jobs and working conditions.*

 Plaintiff emphasizes that the therapists working at Green Hills for both Progressive and RehabCare provide the same type of care, in the same rooms, with similar equipment, using similar charting and evaluation protocols. Defendant points out that, while RehabCare does provide essentially the same services to Green Hills residents as did Progressive, it does so according to its own standards and policies, not those of Progressive. Further-

more, Defendant argues, the working conditions for RehabCare's employees, such as hours of employment, breaks, record keeping requirements, etc., are established by RehabCare, and were not adopted from Progressive. Defendant cites *Smegal* in support of its position that this factor does not weigh in favor of a finding of successor liability.

In *Smegal,* a case arising under Labor Management Relations Act ("LMRA"), the sole question before the court was whether Gateway Foods of Minneapolis, Inc. was a successor employer to National Super Markets, Inc. ("NSM"), such that it was obligated to adhere to the terms of a collective bargaining agreement between NSM and a local union. 819 F.2d at 192. The Eighth Circuit Court of Appeals relied on the fact that the "major test for a successor employer is whether there is substantial continuity between the new operation and the old, particularly with regard to the employees." *Id.* at 193. The Court of Appeals found that the district court was not clearly erroneous in finding that Gateway was not a successor to NSM, since the NSM employees made up only a minority of the new group, because their work and working conditions had changed, and because the services offered had changed. *Id.*

Plaintiff posits that *Smegal* is inapposite because it did not involve returning veterans or application of the relevant Department of Labor factors. While admittedly *Smegal* arose under different statutory authority, the Court disagrees with Plaintiff's contention that it lends nothing to the present analysis. The issue in *Smegal* was fundamentally the same as the issue before this Court, that is, whether one company is

---

**7.** Rod Copple himself is not a direct employee of Green Hills, but rather works for a company called Life Care Services, which provides management services for retirement commu-

nities in the United States. Hr'g Tr. at 135. Likewise, Dr. Montgomery is an independent contractor, and not a direct employee of Green Hills. *Id.* at 141.

a successor in interest to another. The Court of Appeals specifically mentioned that the test for successor liability was one of substantial continuity of business, and specifically noted seven factors to be considered, which factors are virtually identical to those articulated in *Leib* and in the Department of Labor regulation. *Id.* at 194 ("[T]he remaining factors used to evaluate substantial continuity support the district court's decision. The seven factors include: (1) substantial continuity of the same business operations, (2) use of the same plant, (3) continuity of the work force, (4) similarity of jobs and working conditions, (5) similarity of supervisory personnel, (6) similarity in machinery, equipment, and production methods, and (7) similarity of products or services."). Thus, *Smegal* supports Defendant's position that, while performing fundamentally the same work, RehabCare's employees were subject to different working conditions than were Progressive's employees, by virtue of different organizational policies and procedures. Accordingly, while the job of physical therapist for Progressive was similar to the job of physical therapist for RehabCare, the Court cannot say that this factor weighs in favor of one side or the other, given the different working conditions and requirements of Progressive and RehabCare.

6. *Whether there is a similarity of products or services.*

 Plaintiff argues that this factor weighs in her favor because Progressive and RehabCare each provided the same services at Green Hills. Defendant admits that the general rehabilitation services provided are fundamentally the same, but emphasizes that specific services provided to any particular patient may differ from one rehabilitation provider to another. Thus, since the specific services provided are subject to the professional judgment of the therapist involved, the services provided by RehabCare are not necessarily the same as those provided by Progressive. Defendant's position on this factor, while technically true, does not undermine the similarity in services provided by RehabCare and Progressive. Accordingly, the Court finds that this factor weighs somewhat in favor of Plaintiff.[8]

Having considered all of the Department of Labor factors, the Court finds, based on the evidence now before it, that the factors weigh against a finding that RehabCare is a successor in interest to Progressive. Accordingly, the Court finds that Plaintiff will likely not be able to succeed on the merits of her claim, and in turn, that this *Dataphase* factor weighs against issuing a preliminary injunction.

---

**8.** The Court finds that this last factor weighs only "somewhat" in favor of Plaintiff. Much testimony was presented about efforts by Green Hills to become a skilled nursing facility. Plaintiff admits that Progressive ended its contract with Green Hills because it was either unable or unwilling to provide services to Green Hills once Green Hills became a skilled nursing facility. To become a skilled nursing facility under Medicare, Green Hills needs a separate Medicare certification, and has many additional requirements, over and above those that it made available on an outpatient basis. Hr'g Tr. at 69. Plaintiff admitted further that the rehabilitation services provided to a skilled nursing facility would likely be more frequent than for outpatient services, and that the paperwork is monitored more closely. *Id.* at 69. Progressive provided outpatient services as part of its contract with Green Hills, but did not provide skilled nursing facility services. *Id.* at 64. Though Green Hills had not yet become a skilled nursing facility at the time of Plaintiff's return from active duty, and indeed has not to date become a skilled nursing facility, this difference between services provided by Progressive and those that will eventually be provided by RehabCare tempers to some extent the conclusion that the similarity of products and services factor weighs in Plaintiff's favor.

## B. *Irreparable Harm*

The second factor that the Court must consider in its determination of whether or not to issue a preliminary injunction is the threat of irreparable harm to Plaintiff if the injunction is not granted. "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Adam–Mellang v. Apartment Search, Inc.,* 96 F.3d 297, 299 (8th Cir.1996) (quoting *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506–07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)). Absence of irreparable injury is sufficient grounds to deny a preliminary injunction. *See Modern Computer Sys., Inc.,* 871 F.2d at 738.

In support of this factor, Plaintiff argues that, with each day that passes, she suffers the losses associated with being the victim of RehabCare's discrimination. Specifically, Plaintiff notes that her "reduced sense of well-being and the stress arising out of RehabCare's refusal to reinstate her are on-going." Pl.'s Br. at 7. Plaintiff further argues that with each day that passes, she loses another opportunity to work with Dr. George Montgomery, the physician who provides care to many Green Hills residents. Additionally, Plaintiff contends that many residents of Green Hills have waited for a long time for Plaintiff's return and those residents rely on Plaintiff "to develop therapeutic exercise programs specifically designed for each individual in order for them to attain a safer and more active lifestyle." *Id.*

In opposition, Defendant argues that binding Eighth Circuit precedent mandates a finding that Plaintiff's claimed damages cannot give rise to an inference of irreparable harm. Further, Defendant argues that Plaintiff cannot prove irreparable harm because she was actually offered the position that she seeks, i.e., employment as a physical therapist at Green Hills, but turned down that offer. Fur-

ther, Plaintiff was offered, but declined, reemployment by her original employer, Progressive. Indeed, Progressive offered to reinstate Plaintiff in all respects, however, the job would have been in Iowa City rather than at Green Hills in Ames, due to the fact that Progressive no longer had a contract with Green Hills. Hr'g Tr. at 58.

Title 38 U.S.C. § 4323 provides the following remedies for violation of USERRA:

> **Remedies.**—(1) In any action under this section, the court *may* award relief as follows:
>
> (A) The court may require the employer to comply with the provisions of this chapter.
>
> (B) The court may require the employer to compensate the person for any loss of wages or benefits suffered by reason of such employer's failure to comply with the provisions of this chapter.
>
> (C) The court may require the employer to pay the person an amount equal to the amount referred to in subparagraph (B) as liquidated damages, if the court determines that the employer's failure to comply with the provisions of this chapter was willful.
>
> (2)(A) Any compensation awarded under subparagraph (B) or (C) of paragraph (1) shall be in addition to, and shall not diminish, any of the other rights and benefits provided for under this chapter.

38 U.S.C. § 4323(d). Further, § 4323(e) provides that "[t]he court *may* use its full equity powers, including temporary or permanent injunction, temporary restraining orders, and contempt orders, to vindicate fully the rights or benefits of persons under this chapter." *Id.* at § 4323(e) (emphasis added); *see also Bedrossian v. N.W. Mem'l Hosp.,* 409 F.3d 840, 844 (7th Cir.2005) (noting that nothing in the text or legislative history of USERRA authorizes a court to issue preliminary injunctive relief without a showing of irreparable harm).

In *Sampson v. Murray*, the Supreme Court rejected the notion that a purportedly wrongfully discharged employee faced a threat of irreparable injury where she alleged humiliation, damage to reputation, and loss of income. 415 U.S. 61, 89, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) ("The Court of Appeals intimated that either loss of earnings or damage to reputation might afford a basis for finding irreparable injury and provide a basis for temporary injunctive relief. We disagree."); *see also Adam–Mellang*, 96 F.3d at 299 (applying *Sampson*). The *Sampson* Court stated:

> "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."

415 U.S. at 90, 94 S.Ct. 937 (quoting *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C.Cir. 1958)). The Prayer for Relief in Plaintiff's Complaint request the following: (1) a judgment that Defendant willfully violated 38 U.S.C. §§ 4311–13; (2) an injunction directing Defendant to reinstate Plaintiff in the position of physical therapist at Green Hills at the same seniority and pay rates as when she left for military service; (3) award Plaintiff back pay and an equal sum for liquidated damages; (4) award front pay, if necessary; (5) award costs and attorney's fees. Compl. at 6–7.

The Court first notes that all of the monetary damages requested in Plaintiff's Complaint fall squarely within the types of damages that the Supreme Court has found insufficient to demonstrate irreparable injury. Further, the injunctive relief requested by Plaintiff, i.e., that RehabCare reinstate Plaintiff in the position at the same seniority and rate of pay as she had received while employed at Progressive, is also insufficient to establish irreparable injury. According to Plaintiff's own testimony, RehabCare had offers of employment for Plaintiff to work in precisely the position that she now seeks to be "reemployed" in, that is, as a physical therapist stationed at Green Hills. While admittedly RehabCare was offering Plaintiff less money than she believed she was entitled to, Plaintiff could have accepted the offer of employment and then proceeded to litigate the question of whether she was entitled to her previous rate of pay on the theory that RehabCare is a successor in interest to Progressive.[9] Given these facts, it simply cannot be said that Plaintiff faces irreparable injury if the Court declines to force RehabCare to employ Plaintiff in a position that RehabCare already offered, but that Plaintiff declined to accept.

██ To the extent that Plaintiff alleges that she faces irreparable injury because she has suffered the "losses associated with being the victim of discrimination," the Court notes that Plaintiff's Complaint does allege that RehabCare violated 38 U.S.C. § 4311,[10] which prohibits discrimi-

---

**9.** Had Plaintiff chosen this course of action, she would have been protected by USERRA from retaliation or retribution by RehabCare. 38 U.S.C. § 4311(b) prohibits discrimination or adverse employment actions against any person who "has taken an action to enforce a protection afforded ... under [USERRA]" or who "has exercised a right provided for in [USERRA]."

**10.** 38 U.S.C. § 4311 provides in pertinent part:

> (a) A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an

nation against persons who serve in the uniformed services. Specifically, Count I of Plaintiff's Complaint alleges that Rehab-Care's decision to deny Plaintiff employment or reemployment was motivated by Plaintiff's membership and service in the uniformed services. Plaintiff, however, has offered absolutely no evidence in support of this claim. Indeed, all of the pleadings in this matter and all of the evidence presented at hearing focused exclusively on the question of whether RehabCare is a successor in interest to Progressive, such that it has an obligation to reemploy Plaintiff under USERRA in the first instance. Further, even accepting as true Plaintiff's claim that the residents of Green Hills have waited seventeen months for Plaintiff's return, nothing about the residents' wait has any bearing on whether *Plaintiff* faces a threat of irreparable harm such that a preliminary injunction is warranted.

■■■ With regard to Plaintiff's claim that she has a reduced sense of well-being and continues to experience stress as a result of RehabCare's refusal to reemploy her, this emotional harm is insufficient to establish irreparable injury. While the Supreme Court recognized in *Sampson* that "the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found," the facts as alleged by Plaintiff are simply not sufficiently extraordinary to warrant the relief Plaintiff requests. *Sampson*, 94

S.Ct. at 954 n. 68; *see also Adam–Mellang*, 96 F.3d at 300 (finding no irreparable injury where monetary damages and other relief would be sufficient remedy at law to compensate plaintiff for injuries); *Bedrossian*, 409 F.3d at 846 (rejecting a finding of irreparable harm where USERRA plaintiff alleged lost income and damaged reputation). Finally, the Court notes that, even were it inclined to grant the injunctive relief requested by Plaintiff, it would at most be authorized to force RehabCare to employ Plaintiff, not to force Rehab-Care to employ Plaintiff at Green Hills. 38 U.S.C. § 4313 provides that a person protected by USERRA is entitled to be reemployed "in the position of employment in which the person would have been employed ... *or a position of like* seniority, status and pay, the duties of which the person is qualified to perform." 38 U.S.C. § 4313(a)(2)(A) (emphasis added). Thus, even assuming that USERRA is applicable to RehabCare in the first place, Rehab-Care could be fully in compliance with USERRA if it employed Plaintiff in a location other than Green Hills, so long as that position was sufficiently like her position at Green Hills to satisfy the statutory requirements.

### C. Balance of Harms

■■■ The third factor the Court must consider in deciding whether to issue a preliminary injunction is the state of the balance between Plaintiff's alleged harm and the injury that granting the injunction

employer on the basis of that membership, application for membership, performance of service, application for service, or obligation. . . .
(c) An employer shall be considered to have engaged in *actions prohibited—*
 (1) under subsection (a), if the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the em-

ployer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service. . . .
(d) The prohibitions in subsections (a) and (b) shall apply to any position of employment, including a position that is described in section 4312(d)(1)(C) of this title.

will inflict on other parties or litigants. The analysis of this factor is different from the "irreparable harm" analysis. In contrast to the irreparable harm factor, the balance of harms analysis examines the harm of granting or denying the injunction upon both parties to the dispute, as well as to other interested parties. *Dataphase,* 640 F.2d at 114. The balance of harms must tip decidedly toward the plaintiff to justify issuing a preliminary injunction. *See Lynch Corp. v. Omaha Nat'l Bank,* 666 F.2d 1208, 1212 (8th Cir.1981).

Plaintiff argues that any harm Defendant may suffer would be minimal, whereas Plaintiff would suffer irreparable harm if injunctive relief is not granted. Plaintiff further argues that there can be no harm to RehabCare, because RehabCare is not being asked to create a new position for Plaintiff, but merely to comply with federal law. Defendant counters that forcing it to employ Plaintiff would undoubtedly harm it, because RehabCare would be forced to employ a person who has no relationship with RehabCare, and further, who is requesting pay and benefits that are simply unheard of at RehabCare.

The Court finds that the balance of the harms factor weighs against granting a preliminary injunction. First, Plaintiff has not demonstrated that she faces a substantial threat of irreparable harm. Second, Defendant would face substantial harm by being forced to employ Plaintiff, particularly where, as here, the evidence supports a conclusion that RehabCare is *not* a suc-

cessor in interest to Progressive, and thus owes no reemployment obligation to Plaintiff under USERRA. Moreover, "forced reemployments are difficult," particularly in a situation such as the present one where RehabCare has shown that employing Plaintiff at Green Hills for her prior rate of pay is simply out of line with RehabCare's compensation structure.[11] *Keating v. Univ. of S.D.,* 386 F.Supp.2d 1096, 1105 (D.S.D.2005). Finally, as the Court noted *supra,* requiring Defendant to employ or reemploy Plaintiff at Green Hills exceeds the requirements of USERRA, which authorizes an employer to employ a returning veteran in a position of "like seniority, status and pay," as opposed to the precise position previously held.[12] *See* 38 U.S.C. § 4313(a)(2)(A). (emphasis added)

### D. *Public Interest*

■ The final *Dataphase* factor to consider is the public interest. Plaintiff cites only the legislative purpose of USERRA in support of this injunctive factor. Specifically, Plaintiff argues that "the rights of citizen soldiers, who give[ ] up their job, family life and community to serve our country, weigh heavily in favor of granting an injunction in this case." Pl.'s Br. at 8.

The Court agrees that military personnel who serve the United States are entitled to the highest regard and respect. Indeed, such accord has been specifically incorporated into the law via a requirement that veteran reemployment acts are

---

**11.** Melissa Violette testified that no RehabCare employee working at Green Hills or in the Des Moines, Iowa area is making $51.28 per hour. Hr'g Tr. at 131–32. Additionally, Trent Hermen, the director of business development for RehabCare, testified that, once Green Hills becomes an SNF, it would be virtually impossible for RehabCare to cover a salary as high as the one Plaintiff requests, due to the fact that it would exceed Medicare Part A reimbursement rates. *Id.* at 161–63.

**12.** 38 U.S.C. § 4313(a)(1)(A) requires an employer to reemploy an eligible person "in the position of employment in which the person would have been employed," with no alternative for employment in a "like" position. Section 4313(a)(1)(A), however, only applies in the event that the period of service in the military services was "for less than 91 days."

to be liberally construed in favor of the returning soldier. *See, e.g., Coffy v. Republic Steel Corp.*, 447 U.S. 191, 196, 100 S.Ct. 2100, 65 L.Ed.2d 53 (1980); *Dyer v. Hinky Dinky, Inc.*, 710 F.2d 1348, 1350 (8th Cir.1983). The fact remains, however, that even the most liberal construction of USERRA would not support the conclusion that Plaintiff seeks to have the Court draw, that is, that RehabCare is Progressive's successor in interest. Accordingly, the Court cannot say that the public interest supports a preliminary injunction forcing RehabCare to employ Plaintiff where the relevant considerations clearly demonstrate that RehabCare is not subject to USERRA in the first instance.

## III. CONCLUSION

After considering all of the *Dataphase* factors, the Court concludes that the balance of the equities do not support a preliminary injunction. Specifically, the Court finds that: (1) Plaintiff has not established a likelihood of success on the merits; (2) Plaintiff has not established that she will suffer irreparable harm if the preliminary injunction is not issued; (3) Plaintiff has not shown that the balance of harms weigh in favor of issuing a preliminary injunction; and (4) Plaintiff has not shown that the public interest weighs in favor of issuing a preliminary injunction. Plaintiff's motion for a preliminary injunction (Clerk's No. 13), is therefore, **DENIED.**

IT IS SO ORDERED.