**Pamela F. REYNOLDS, Plaintiff,**

v.

**REHABCARE GROUP EAST INC., Defendant.**

**No. 4:07–cv–00388.**

United States District Court,
S.D. Iowa,
Central Division.

Dec. 12, 2008.

Thomas S. Reavely, Whitfield & Eddy, PLC, Des Moines, IA, Beth A. Townsend, Townsend Law Office PLC, West Des Moines, IA, for Plaintiff.

Scott M. Brennan, Davis Brown Koehn Shors & Roberts, Des Moines, IA, George R. Wood, Littler Mendelson PC, Minneapolis, MN, for Defendant.

## ORDER

ROBERT W. PRATT, Chief Judge.

Pamela Reynolds ("Plaintiff") filed the present action against RehabCare Group East Inc. ("Defendant" or "RehabCare") on August 29, 2007 (Clerk's No. 1), alleging that Defendant violated the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4301–33. Specifically, Plaintiff claims that Defendant violated § 4311 of USERRA by discriminating against her because of her military service and that Defendant violated §§ 4312–13 by refusing to offer her reemployment after her return from active military service. Defendant filed an Answer to Plaintiff's Complaint on October 1, 2007. Clerk's No. 11. On October 4, 2007, Plaintiff filed a Motion for Preliminary Injunction. Clerk's No. 13. Following a hearing, the Court denied Plaintiff's request for a preliminary injunction in an Order dated January 29, 2008.

See *Reynolds v. Rehabcare Group East Inc.*, 531 F.Supp.2d 1050 (S.D.Iowa 2008).

On March 26, 2008, Defendant filed the present Motion for Summary Judgment. Clerk's No. 33. After receiving an extension of time for the purpose of conducting additional discovery, Plaintiff filed a Resistance to Defendant's Motion for Summary Judgment on August 15, 2008. Clerk's Nos. 49–50. Defendant filed a Reply to Plaintiff's resistance on September 3, 2008. Clerk's No. 57. Neither party has requested a hearing and the matter is, therefore, fully submitted.

## I. FACTUAL BACKGROUND

Plaintiff is a licensed physical therapist in the State of Iowa. Def.'s Material Facts ¶ 21. In 2002, Plaintiff began providing physical therapy services at Green Hills Retirement Community ("Green Hills") in Ames, Iowa. *Id.* ¶ 22. Green Hills has contracted with LifeCare Services, Inc. ("LifeCare") to provide management services to Green Hills' residents. *Id.* ¶ 2. Rod Copple ("Copple"), Green Hills' Executive Director, is an employee of LifeCare. *Id.* ¶ 3. Various independent entities provide vendor services at Green Hills. *Id.* ¶ 4. One such vendor service provided to Green Hills' residents is rehabilitative therapy. *Id.*

At no time has Plaintiff ever been employed by Green Hills. *Id.* ¶ 5. Rather, Plaintiff provided physical therapy services at Green Hills beginning in 2002 pursuant to Green Hills' contract for rehabilitation services with Plaintiff's employer, MJ Care. *Id.* ¶¶ 22–23. MJ Care's contract with Green Hills ended in early 2004. *Id.* ¶ 24. Green Hills then entered into a contract with Progressive Rehab Associates ("Progressive"), a company that provides rehabilitation services in various communities throughout Iowa. *Id.* ¶¶ 6, 25. Progressive provided rehabilitation services at Green Hills from May 1, 2005 to June 30,

2007. *Id.* ¶ 7. Plaintiff became an employee of Progressive in May 2004, *id.* ¶ 26, and provided rehabilitation services at Green Hills for Progressive until she was deployed to active military duty on March 23, 2006.[1] *Id.* ¶ 28. Plaintiff served on active duty at Fort Hood, Texas from March 23, 2006 to July 8, 2007. *Id.* ¶ 30.

On May 3, 2007, while Plaintiff was stationed at Fort Hood, Progressive gave Green Hills sixty days notice that it was terminating the contract for rehabilitation services, apparently due to Green Hills' decision to become a Skilled Nursing Facility ("SNF").[2] *Id.* ¶¶ 31–33. Upon learning of Progressive's decision in this regard, Green Hills began the process of locating a new vendor for rehabilitation services.[3] On July 26, 2007, Green Hills ultimately contracted with Deerfield Retirement Community ("Deerfield"),[4] which in turn, subcontracted with RehabCare, a company that provides rehabilitation services for health care facilities nationwide, for the provision of rehabilitation services at Green Hills. *Id.* ¶¶ 11–13, 37–38. RehabCare was aware of Plaintiff's military service commitments prior to signing the contract with Deerfield to provide services at Green Hills. Pl.'s Material Facts ¶ 77. Plaintiff has never been employed by RehabCare. Def.'s Material Facts ¶ 14.

At the time of her deployment, Plaintiff was receiving $51.28 per hour as an employee of Progressive. She worked 30 hours per week, had three weeks of annual vacation, and was allowed to participate in Progressive's 401K program. Hr'g Tr. at 39. On June 5, 2007, during her "terminal leave" from the military,[5] Plaintiff contacted Progressive and Copple and stated that she was "reapplying for [her] position as physical therapist at Green Hills," pursuant to USERRA. Pl.'s App. at 221. In a post script to Copple specifically, Plaintiff stated her understanding that "Progressive is ending its relationship with Green Hills" and asserted that any successor contractor would be "a 'successor in interest' and covered by USERRA." *Id.* A copy of Plaintiff's letter was forwarded to RehabCare.[6]

---

1. Plaintiff joined the Army Reserves in 1999 as a First Lieutenant and currently holds the rank of Major. Def.'s Material Facts ¶ 27. She was notified in November 2005 that she would be activated for military duty on March 23, 2006. *Id.* ¶ 28. She sought, and was granted, a military leave of absence from Progressive. *Id.* ¶ 29.

2. Defendant contends that Progressive was not qualified to provide rehabilitation services for an SNF, whereas Plaintiff argues that Progressive simply had staffing concerns and, therefore, declined to provide services for SNFs. *See* Def.'s Material Facts ¶ 33; Pl.'s Response ¶ 33. The reason for Progressive's termination of services at Green Hills is not material to the present dispute.

3. While Plaintiff admits that Progressive's contract with Green Hills terminated in June 2007, Plaintiff contends that Progressive nonetheless continued to provide rehabilitation services at Green Hills until July 28, 2007. Copple testified at the Hearing on

Plaintiff's Motion for Injunction that Progressive actually subcontracted with a physical therapy group in Boone, Iowa to provide this "transitional" coverage. *See* Hr'g Tr. at 149.

4. Deerfield is a retirement community located in Des Moines, Iowa. Def.'s Material Facts ¶ 10.

5. "Terminal leave" is leave time Plaintiff accrued that she was permitted to take prior to the formal termination of her active duty status. According to Plaintiff, she was "free to begin employment with a civilian employer" once she commenced terminal leave. Pl.'s Material Facts ¶ 78.

6. Plaintiff contends that Progressive forwarded the letter to RehabCare. Pl.'s Material Facts ¶ 78. Defendant contends that Copple forwarded the letter to RehabCare. Def.'s Response to Pl.'s Material Facts ¶ 78. In fact, an e-mail from Copple to Colleen Jones stated that Copple had "faxed and emailed [Plain-

Plaintiff had ongoing discussions with Melissa Violette ("Violette"), the regional manager of operations for RehabCare, beginning in June 2007. *See generally* Hr'g Tr. (Pl.'s Testimony at 34–59). Plaintiff maintained during these conversations that RehabCare was obligated to "reemploy" her under USERRA. *Id.* Violette told Plaintiff that she would provide the information to her supervisors, as RehabCare had a policy of not making employment offers of any sort until such time as it actually had a contract with a specific retirement home in place. *Id.* at 43. After their conversations, Violette sent Plaintiff an application for employment with RehabCare.

Plaintiff filled out the application on July 11, 2007, making substantial changes to the form of the application. *See* Def.'s Ex. E. Specifically, Plaintiff crossed out the word "employment" in the heading, "Application for Employment," and hand-wrote "ReEmployment/USERRA" in its place. Plaintiff further wrote: "I am an employee of Progressive Rehab Associates returning from 16 months of Active Duty with the United States Army. I am seeking re-employment as physical therapist at Green Hills Retirement Community." *Id.* Plaintiff also crossed out the "Applicant Statement," certifying that the information in the application was true and acknowledging that employment would be at-will, and wrote "Not applicable-See USERRA." *Id.*

Violette asked Plaintiff to meet her at Green Hills on July 27, 2007, the first day that RehabCare was to be present at Green Hills. Hr'g Tr. at 46. Plaintiff met with Violette for approximately an hour or an hour and one-half, during which time they reviewed patient records and Plaintiff gave Violette a tour of the building. *Id.* at 46–47. Plaintiff also introduced Violette and another RehabCare employee to various Green Hills staff. *Id.* at 49. Following the tour, Plaintiff and Violette spoke privately. *Id.* at 50–51. Violette told Plaintiff that RehabCare really wanted to bring Plaintiff on as an employee, but that RehabCare did not think that USERRA applied to it because RehabCare did not purchase any of Progressive's assets. *Id.* at 51. Plaintiff responded that she believed that USERRA did apply and that her lawyer would contact RehabCare's lawyer. *Id.* Violette informed Plaintiff during this meeting that RehabCare had offers of employment for Plaintiff to employ her as a physical therapist at Green Hills, but Plaintiff refused to hear the offers, maintaining that "if they are not going to honor the USERRA law and reinstate me into my job that I had prior to leaving, I didn't want to hear the offer." *Id.* at 83. Since that time, Plaintiff has not had any further personal communication with RehabCare, except in the context of this litigation, and she has not worked for RehabCare in any capacity.

## II. STANDARD OF REVIEW

The plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of

tiff's letter] to [Progressive's owners] (Joe and Steve)." Pl.'s App. at 220. Regardless, there is no real dispute that RehabCare was aware that Plaintiff believed that whatever company took over rehabilitation services at Green Hills would be obligated to "reemploy" her under USERRA. Indeed, Plaintiff talked with Melissa Violette, the regional manager of operations for RehabCare, in June 2007. Violette told Plaintiff that RehabCare was aware that Copple wanted Plaintiff to return to Green Hills and that RehabCare was interested in discussing the matter with Plaintiff. Hr'g Tr. at 38.

proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.,* 541 F.2d 207, 209 (8th Cir.1976) (citing *Windsor v. Bethesda Gen. Hosp.,* 523 F.2d 891, 893 n. 5 (8th Cir.1975)). The purpose of the rule is " 'not to cut litigants off from their right of trial by jury if they really have issues to try,' " *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)), but to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.,* 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Bd. of Educ.,* 523 F.2d 340, 347 (8th Cir.1975)).

The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994). The court does not weigh the evidence nor make credibility determinations; rather, the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers,* 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.").

Employment actions are inherently fact based, and the Eighth Circuit has repeatedly cautioned that in employment discrimination cases, summary judgment should "seldom be granted ... unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." *Hindman v. Transkrit Corp.,* 145 F.3d 986, 990 (8th Cir.1998) (citations omitted); *see also Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994) ("[S]ummary judgment should seldom be used in employment-discrimination cases."); *Hillebrand v. M–Tron Indus., Inc.,* 827 F.2d 363, 364 (8th Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). This is because "inferences are often the basis of the claim ... and 'summary judgment should not be granted unless the evidence could not support any reasonable inference' of discrimination." *Breeding v. Arthur J. Gallagher & Co.,* 164 F.3d 1151, 1156 (8th Cir.1999) (quoting *Lynn v. Deaconess Med. Ctr.—W. Campus,* 160 F.3d 484, 486–87 (8th Cir.1998)).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See* Fed. R.Civ.P. 56(c), (e); *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere

existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### III. LAW AND ANALYSIS

#### A. *Plaintiff's Right to Reemployment under 38 U.S.C. §§ 4312–13*

Amongst other things, Congress enacted USERRA for the express purpose of "minimiz[ing] the disruption to the lives of persons performing service in the uniformed services as well as to their employers, their fellow employees, and their communities, by providing for the prompt reemployment of such persons upon their completion of such service." 38 U.S.C. § 4301(a)(2). In furtherance of this purpose, section 4312 provides that: "[A]ny person whose absence from a position of employment is necessitated by reason of service in the uniformed services shall be entitled to the reemployment rights and benefits and other employment benefits of this chapter" if the person: (1) gave advance notice of their service to their employer; (2) was absent for service in the uniformed services for a period not exceeding five years; and (3) reports to or submits an application for reemployment within 90 days after the completion of uniformed service. Section 4313 provides that a person eligible for reemployment under USERRA "shall be promptly reemployed ... in the position of employment in which the person would have been employed if the continuous employment of

such person with the employer had not been interrupted by such service, or a position of like seniority, status and pay, the duties of which the person is qualified to perform." 38 U.S.C. § 4313(a)(2)(A). An employer, for purposes of USERRA, is "any person, institution, organization, or other entity that pays salary or wages for work performed or that has control over employment opportunities, including ... *any successor in interest* to a person, institution, organization, or other entity referred to in this subparagraph." 38 U.S.C. § 4303(4)(A)(iv) (emphasis added).

There is no question that Plaintiff met all of the requirements to be eligible for reemployment under USERRA. Rather, as the Court noted in its Order on Plaintiff's Motion for Preliminary Injunction, "the fighting issue in this case is whether Plaintiff has a right to reemployment *by RehabCare*, given that she was employed by Progressive at the time of her deployment to active military service." *Reynolds*, 531 F.Supp.2d at 1056 (emphasis added). More specifically, the question is whether RehabCare is a "successor in interest" to Progressive, such that it was obligated to "reemploy" Plaintiff under USERRA.

USERRA does not define the term "successor in interest." The applicable Department of Labor regulations, however, provide the following:

**Is a successor in interest an employer covered by USERRA?**

USERRA's definition of "employer" includes a successor in interest. In general, an employer is a successor in interest where there is a substantial continuity in operations, facilities, and workforce from the former employer. The determination whether an employer is a successor in interest must be made on a case-by-case basis using a multi-factor test that considers the following:

(a) Whether there has been a substantial continuity of business operations

from the former to the current employer;

(b) Whether the current employer uses the same or similar facilities, machinery, equipment, and methods of production;

(c) Whether there has been a substantial continuity of employees;

(d) Whether there is a similarity of jobs and working conditions;

(e) Whether there is a similarity of supervisors or managers; and,

(f) Whether there is a similarity of products or services.

20 C.F.R. § 1002.35. A nearly identical test for successor liability was employed by the Eighth Circuit Court of Appeals in *Leib v. Georgia–Pacific Corp.*, a case arising under a USERRA predecessor, the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. §§ 2021 et seq.[7] *Leib*, 925 F.2d 240, 247 (8th Cir.1991) (adopting a test for successor liability that includes consideration of circumstances such as "whether there is (1) substantial continuity of the same business operations, (2) use of the same plant, (3) continuity of work force, (4) similarity of jobs and working conditions, (5) similarity of supervisory personnel, (6) similarity in machinery, equipment, and production methods, and (7) similarity of products or services.") (citing *Smegal v. Gateway Foods of Minneapolis, Inc.*, 819 F.2d 191, 193 (8th Cir. 1987)). Indeed, the legislative history of USERRA states: "The Committee intends that the multi-factor analysis utilized by the court in *Leib v. Georgia–Pacific Corp.* is to be the model for successor in interest issues, except that the successor's notice or awareness of a reemployment rights claim at the time of merger or acquisition should not be a factor in this analysis." H.R.Rep. No. 103–65, *reprinted in* 1994 U.S.C.C.A.N. 2449 at 2454.

In its Order on Plaintiff's Motion for Preliminary Injunction, this Court discussed extensively the only two reported cases that have considered questions of successor in interest liability under USERRA—*Coffman v. Chugach Support Services, Inc.*, 411 F.3d 1231, 1232 (11th Cir. 2005), and *Murphree v. Communications Technologies, Inc.*, 460 F.Supp.2d 702, 704 (E.D.La.2006). *See Reynolds*, 531 F.Supp.2d at 1058–60. The Court specifically declined to employ *Coffman's* "ownership and control" test,[8] favoring instead the "business continuity test" employed in *Leib*, adopted in *Murphree*, and requested by Plaintiff. *Id.* at 1060. Accordingly, bearing in mind the different standard of review applicable to the present Motion for Summary Judgment, the Court turns now, as it previously did with respect to Plaintiff's Motion for Preliminary Injunction, to an evaluation of each of the six Department of Regulation factors to determine whether RehabCare is a successor in interest to Progressive.

1. *Whether there has been a substantial continuity of business operations from the former to the current employer.*

Defendant urges that the undisputed evidence shows that there has been no

---

**7.** The *Leib* test puts forth seven factors for consideration of whether one entity is a successor in interest to another, while the Department of Labor regulation puts forth only six factors. Two of the *Leib* factors, however, "use of the same plant" and "similarity of jobs and working conditions," are combined in the second factor of the Department of Labor regulation, which asks "[w]hether the current employer uses the same or similar facilities, machinery, equipment, and methods of production." *Compare Leib*, 925 F.2d at 247 *with* 20 C.F.R. § 1002.35.

**8.** The district court in *Coffman* determined that an analysis of the *Leib* factors "is unnecessary and improper when no merger or transfer of assets even transpired between the two subject companies." *Coffman*, 411 F.3d at 1237.

substantial continuity of Progressive's business by RehabCare. Specifically, Defendant points out numerous facts that demonstrate a lack of substantial continuity of business operations between Progressive and RehabCare. Plaintiff has never been employed by either RehabCare or Green Hills. Def.'s Material Facts ¶¶ 5, 14. Progressive not only has no relationship with RehabCare, but also has no existing relationship with Green Hills, never owned any portion of Green Hills, and never purchased any equipment for Green Hills—the only relationship between Progressive and Green Hills was a contractual one that ended when Progressive terminated it. *Id.* ¶¶ 19;[9] Hr'g Tr. at 62–63.[10] RehabCare did not "assume or take over" Progressive's contract with Green Hills, but rather entered into a separate contractual relationship with Deerfield, which had entered into a contractual arrangement with Green Hills that was separate and distinct from the contract between Progressive and Green Hills. Def.'s Material Facts ¶¶ 8, 11, 13. Progressive removed all of its patient files from Green Hills by August 19, 2007, and also removed equipment and supplies. *Id.* ¶ 42; Pl.'s Response ¶ 42. The services provided at Green Hills by RehabCare, other than to the extent their performance is governed by state law, was provided according to RehabCare's standards and policies, not Progressive's standards and policies. Def.'s Material Facts ¶ 46; Pl.'s Response ¶ 46.[11] RehabCare purchased absolutely nothing from Progressive, and it conducted independent assessments of all patients, started its own patient files, and utilized its own employees. Hr'g Tr. at 132 (Violette Testimony). Finally, when asked at the hearing on the Motion for Preliminary Injunction whether RehabCare's business operations at Green Hills were "separate and distinct from the operations that Progressive had," Plaintiff replied, "Yes." Hr'g Tr. at 65.

Plaintiff counters these factors by arguing that there is a substantial continuity of operations between Progressive and RehabCare because RehabCare: provided the same types of rehabilitative services that Progressive provided to Green Hills residents; the services were provided in the same facility using the same or "func-

---

9. Plaintiff denied Defendant's assertion that "Progressive has no current contractual relationships with Green Hills, Deerfield, or RehabCare," asserting that the contract between Progressive and Green Hills provides for "a continuing contractual duty to provide records as needed." Pl.'s Response ¶ 19. The Court finds this minimal continuing duty immaterial to the successor in interest analysis. Furthermore, Plaintiff's denial is more appropriately a "qualification," given Plaintiff's own testimony at the Hearing on Plaintiff's Motion for Preliminary Injunction that Progressive has no continuing relationship at all with Green Hills. *See* Hr'g Tr. at 60.

10. Plaintiff testified as follows at the Hearing on Plaintiff's Motion for Preliminary Injunction:

    Q. Okay. Progressive never owned any portion of Green Hills assets; is that correct?

    A. Not to my knowledge.

    Q. And never bought any equipment for—from Green Hills, correct?

    A. Not to my knowledge.

    Q. And then conversely, Green Hills, never owned any portion of Progressive; correct?

    A. Not that I'm aware of.

    Q. To your understanding the only relationship that ever existed between Green Hills and Progressive was this independent contractor relationship; correct?

    A. That's my understanding.

    Hr'g Tr. at 62–63.

11. *See also* Hr'g Tr. at 66 (Plaintiff's testimony: Q: "Progressive had its own policies and procedures how things were done, correct?" A: "Yes." Q: And ... RehabCare has its own policies and procedures on how things were done?" A: "Yes.").

tionally equivalent" equipment as that used by Progressive; RehabCare treated the same Green Hills residents as Progressive did; physical therapy prescriptions were made by the same physicians using the same forms for both Progressive and RehabCare; Lynn Mitchell ("Mitchell"), the director of nursing, and Dr. George Montgomery ("Dr. Montgomery") both maintained authority to prohibit physical therapists, whether from Progressive or RehabCare, from accessing patients; and Progressive and RehabCare both used forms based on Medicare mandated forms 700 and 701. Plaintiff further contends that the only real differences in Progressive's business operations and RehabCare's business operations are that RehabCare utilizes, though only rarely, a few additional pieces of therapy equipment, and that RehabCare might have provided slightly different services to specific Green Hills residents based on their unique needs. Thus, Plaintiff concludes, "a reasonable jury could find that Defendant continued to practice the business in the same manner and with the same fashion as its predecessor establishing that Defendant is a successor in interest." Pl.'s Br. at 24–25.

Based on the record before it, the Court concludes that Plaintiff cannot demonstrate a continuity of business operations between Progressive and RehabCare, let alone a "substantial" continuity of business operations as required by the Department of Labor regulation. Indeed, the only "continuity" in this case comes by virtue of the fact that both Progressive and RehabCare provided, as a part of their overall business operation, physical therapy services on the Green Hills campus. Other than this commonality, Progressive and RehabCare had no relationship whatsoev-

er. The mere fact that Progressive and RehabCare provided similar services to Green Hills by virtue of entirely separate and distinct contractual relationships, however, is insufficient to establish a "continuity of business operations" between Progressive and RehabCare. Indeed, to find otherwise would improperly blur the distinction between all independent service providers in a particular field.

2. *Whether the current employer uses the same or similar facilities, machinery, equipment, and methods of production.*

Defendant next contends that there is no genuine issue of material fact on the question of whether RehabCare used the same or similar facilities, machinery, equipment, and methods of production. Specifically, Defendant points out that RehabCare did not purchase any of Progressive's equipment or supplies,[12] Def.'s Material Facts ¶ 35, and that the specific types of rehabilitation services offered to any Green Hills resident may vary depending on the professional opinion of the therapist and on the wishes of the resident's treating physician. Def.'s Br. at 7. Thus, Defendant argues, the "methods of production" employed by RehabCare are not the same as those utilized by Progressive. *Id.* Defendant additionally points out that the only real similarity between RehabCare and Progressive is the fact that both offered services on the Green Hills campus, a factor controlled by federal and state requirements that rehabilitation services be provided *on* the retirement facility's campus. Def.'s Material Facts ¶ 44.

Plaintiff focuses her counter argument on the premise that a "reasonable jury could find that the physical therapy pro-

**12.** Much of the therapy equipment employed by both Progressive and RehabCare was   owned exclusively by Green Hills.

vided to the residents at Green Hills after Defendant took over the operation on July 27, 2007 was the same as that provided by Progressive." Pl.'s Br. at 25. In particular, Plaintiff points out that the Green Hills residents receiving therapy were the same, that the equipment and therapy room, both owned by Green Hills, were utilized by both Progressive and RehabCare in providing therapy, and that Progressive and RehabCare both used the same types of Medicare-mandated forms. *Id.*

As it did with respect to Plaintiff's Motion for Preliminary Injunction, the Court agrees that Progressive and RehabCare provide fundamentally the same services, that is, occupational, speech, and physical therapy rehabilitation. The Court also agrees that these services were provided in the same location and in generally the same way by both Progressive and RehabCare. Plaintiff concedes, however, that this would be an equally true correlation between Progressive and any other rehabilitation services provider that might have entered into a contract with Green Hills. Given these factors, the Court believes that this factor is neutral in the determination of whether RehabCare is a successor in interest to Progressive.

3. *Whether there has been a substantial continuity of employees.*

With regard to whether there was a substantial continuity of employees between Progressive and RehabCare, Defendant contends simply that "[n]o employees who previously worked for Progressive are currently working for RehabCare." Def.'s Br. at 8. Plaintiff does not dispute this fact, but argues instead that the Green Hills personnel that provided oversight of physical therapy services at Green Hills, namely Mitchell, Dr. Montgomery, and Copple, remained unchanged between Progressive and RehabCare. The Court previously rejected the contention that a continuity of

Green Hills staff was sufficient to establish a continuity of employees for purposes of determining whether RehabCare is Progressive's successor in interest:

> Plaintiff offers absolutely no support for the proposition that this Court should evaluate continuity of employees by looking at whether the employees at Green Hills were the same during the contracts of Progressive and RehabCare. The question before the Court is whether Plaintiff is entitled to be reemployed by *RehabCare* on the basis that RehabCare is a successor in interest to *Progressive,* not whether Plaintiff is entitled to be reemployed by Green Hills. The fact that Progressive and RehabCare each provided services on the Green Hills campus does not change the fundamental fact that Plaintiff *was never employed by Green Hills.* Were this Court to adopt Plaintiff's position, successor interest liability under USERRA would be broadened beyond all logical bounds.

*Reynolds,* 531 F.Supp.2d at 1062. Thus, as it did in its previous Order, the Court "finds that this factor weighs decidedly in favor of Defendant." *Id.*

Plaintiff makes one alternative argument regarding the substantial continuity of employees factor, namely that the factor should be eliminated from consideration in this case because RehabCare discriminated against Plaintiff on the basis of her military service. Plaintiff cites *Systems Management, Inc. v. NLRB,* 901 F.2d 297 (3d Cir.1990) and *Kallmann v. NLRB,* 640 F.2d 1094 (9th Cir.1981) in support of this proposition. In both cases, which dealt with the applicability of union collective bargaining agreements when a company is purchased by new owners, the definition of "successor employer" depended on a finding that the "majority of the employees of the former enterprise were hired by the

new employer." *Systems Mgmt.*, 901 F.2d at 302 (citing *Howard Johnson Co. v. Detroit Local Joint Executive Bd., Hotel & Restaurant Employees*, 417 U.S. 249, 263, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974) (requiring a "substantial continuity in the identity of the work force across the change in ownership")); *Kallmann*, 640 F.2d at 1100. The courts declined to require that this factor be proven where the new owner's discriminatory refusal to hire union members was the cause for the lack of continuity in the work force. *See Kallmann*, 640 F.2d at 1100–01 ("'It is manifest that but for [the new owner's] discriminatory refusal to offer employment to [the union's bargaining] unit employees, the Union would have continued to enjoy a majority representative status. We decline to permit an employer to rely upon its own wrongdoing and thus avoid its legal responsibilities.") (quoting *NLRB v. Foodway of El Paso*, 496 F.2d 117, 120 (5th Cir.1974)). Plaintiff urges that the Court should adopt the reasoning of *Systems Management* and *Kallmann* and conclude that "Defendant should therefore not be rewarded for its refusal to hire Plaintiff." Pl.'s Br. at 26.

Plaintiff's argument in this regard is wholly without merit. Even assuming that Plaintiff could prove that Defendant discriminated against her on the basis of her military service, the fact remains that if RehabCare *had* hired Plaintiff, it would have had a grand total of *one* employee that was formerly employed by Progressive. The regulations require a "substantial" continuity of employees. While the term "substantial" is not defined in the regulations, it is commonly understood to refer to an "ample or considerable amount." Oxford English Dictionary Online, *available at* http://dictionary.oed.com (last visited December 10, 2008). The Court is hard pressed to imagine a scenario where "one" could be deemed "substantial" for purposes of this factor.

4. *Whether there is a similarity of supervisors or managers.*

Defendant contends that there is no similarity between the supervisors and managers of Progressive and those of RehabCare. Plaintiff, on the other hand, points out that regardless of whether Progressive or RehabCare was providing therapy services, Dr. Montgomery and Mitchell both maintained the same ultimate responsibility and authority for oversight of physical therapy at Green Hills. Plaintiff further points out that Copple also maintained the same oversight requirements for all employees or contractors working at Green Hills, pursuant to state law. Pl.'s Br. at 29 ("Thus, Mr. Copple's responsibilities for ensuring that the individuals providing therapy to the residents of Green Hills remained unchanged after July 27, 2007."). Additionally, Plaintiff contends that RehabCare did not dictate to its therapists how therapy was performed at Green Hills and maintained "little supervision and oversight of the individual physical therapists." *Id.*

Plaintiff admitted at the Hearing on her Motion for Preliminary Injunction that her supervisors at Progressive, Joe Albright and Drew Bossum, were no longer supervising anyone at Green Hills, and that RehabCare had its own supervisors and managers, none of whom ever worked for Progressive. Hr'g Tr. at 66. Though Plaintiff indicated that she had some supervision at Green Hills by Copple, Dr. Montgomery, nursing staff, etc., she further admitted that not one of those people had the right to hire her, fire her, or indeed take any action worse than insisting to Progressive that she not be allowed to provide services at Green Hills. *Id.* at 96. Copple testified at the same hearing that "[n]o one at Green Hills, including Dr. Montgomery, has the ability to take any direct supervisory actions against any of

the RehabCare employees." Hr'g Tr. at 153. Dr. Montgomery testified at deposition that none "of the Green Hills staff or any of the people working there" had the right "to hire or fire anyone at all." Pl.'s App. at 130.

Despite the clear and undisputed fact that not a single Progressive manager or supervisor became a manager or supervisor for RehabCare, Plaintiff nonetheless maintains that *Murphree* and *Burns Int'l Security Services Inc. v. NLRB*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), are "dispositive to the case at bar" and require the Court to find that this factor of the analysis weighs in her favor. In *Murphree*, Major Thomas Murphree worked for a military support contractor, MPRI, Inc. ("MPRI") as an Assistant Professor of Military Science ("APMS") at Tulane University. *Murphree*, 460 F.Supp.2d at 704. At the time, MPRI had completed three years of a four year contract with the United States Army to staff the ROTC system partially with contract employees. *Id.* Just prior to Murphree's activation, COMTek won the contract and was designated to assume it from MPRI about six months later. *Id.* While deployed, MPRI filled Major Murphree's position at Tulane University and a second Tulane University APMS position was moved by the Army to Alabama.

When Major Murphree sought reemployment under USERRA, COMTek informed him that neither of the APMS positions that previously existed at Tulane were available. *Id.* COMTek invited Major Murphree to apply for any APMS position in the nation, but emphasized its position that it owed Major Murphree no reemployment obligation because Major Murphree had been an employee of MPRI, not of COMTek. *Id.* Eventually, COMTek offered Major Murphree the APMS position in Alabama, but Major Murphree declined the offer because he viewed the position as inferior to his position at Tulane, and because he did not wish to relocate his family. *Id.* Despite a finding by the Department of Labor's Veterans Employment and Training Service that COMTek was a successor in interest to MPRI, COMTek refused to rehire Major Murphree as an APMS at Tulane. *Id.* Major Murphree sued for, amongst other things, violation of USERRA.

The district court in *Murphree* noted that COMTek had provided "no evidence to show that it is not a successor-in-interest under the *Leib* factors or the regulations" and that the available evidence "tend[ed] to support [Murphree's] position" that COMTek was a successor in interest to MPRI. *Id.* at 709. The court stated that genuine issues of material fact with regard to the *Leib* factors prevented a grant of summary judgment. *Id.* Specifically, the court noted, apparently in its attempt to address the "similarity of supervisors and managers" factor, that "Cadet Command clearly retained its administrative oversight of the ROTC program after the transition." *Id.* Plaintiff is apparently requesting that the Court draw a parallel with the present case and conclude that Dr. Montgomery, Mitchell, and Copple are the equivalent of Cadet Command. The Court, however, does not believe that *Murphree* offers compelling support for Plaintiff's argument. In *Murphree*, the precise contours of the relationships between the Army, Cadet Command, and MPRI or COMTek were neither addressed nor discussed. Furthermore, even assuming that the relationships were functionally equivalent to those in the present case, there is no indication that the *Murphree* court placed particular emphasis on this factor. Indeed, the conclusion that summary judgment was improper was equally, if not more, appropriate based on the court's findings that COMTek promised substantial continuity in the transition

from MPRI, there was a significant continuity in the equipment used by MPRI and COMTek, there was a substantial continuity of employees,[13] and there was a substantial similarity of jobs and working conditions. *Id.*

Plaintiff next cites *Burns* for the proposition that "when a service contract is involved, there is no requirement that the identical supervisors be hired by the successor for there to be continuity of the business operation." Pl.'s Br. at 28. In *Burns,* Burns International Security Services, Inc. ("Burns") replaced Wackenhut Corp. ("Wackenhut") in providing plant protection services to Lockheed Aircraft Service. *Burns,* 406 U.S. at 274, 92 S.Ct. 1571. Despite employing 27 former Wackenhut guards amongst its 42 total guards, Burns refused to bargain with the United Plant Guard Workers of America union, which had a National Labor Relations Board ("NLRB") certified collective bargaining agreement with Wackenhut. *Id.* The Supreme Court held that "where the bargaining unit remains unchanged and a majority of the employees hired by the new employer are represented by a recently certified bargaining agent there is little basis for faulting the [NLRB's order requiring] the employer to bargain with the incumbent union." *Id.* at 281, 92 S.Ct. 1571. The Court noted that, in the underlying decision, the Court of Appeals was "unimpressed with the asserted differences between Burns' and Wackenhut's operations":

> All of the important factors which the Board has used and the courts have approved are present in the instant case: "continuation of the same types of product lines, departmental organization, employee identity and job functions." ... Both Burns and Wackenhut are nation-

wide organizations; both performed the identical services at the same facility; although Burns used its own supervisors, their functions and responsibilities were similar to those performed by their predecessors; and finally, and perhaps most significantly, Burns commenced performance of the contract with 27 former Wackenhut employees out of its total complement of 42. Although the labor policies of the two companies differed somewhat, the Board's determination that the bargaining unit remained appropriate after the changeover meant that Burns would face essentially the same labor relations environment as Wackenhut: it would confront the same union representing most of the same employees in the same unit.

*Burns,* 406 U.S. at 281 n. 4, 92 S.Ct. 1571 (quoting *William J. Burns Int'l Detective Agency, Inc. v. NLRB,* 441 F.2d 911, 915 (2d Cir.1971)).

The Court does not read *Burns* so broadly as Plaintiff. The case does not forego any "requirement that the identical supervisors be hired by the successor for there to be continuity of the business operation" as Plaintiff contends. Rather, *Burns* provides, exactly the way *Leib* does, that a similarity in managers and supervisors is but one factor to be considered in the overall calculus of determining whether one entity is the successor of another. Nothing in *Burns,* however, can be read to support the argument that Plaintiff is making in this case, i.e., that the Court can find a similarity of supervisors and managers based on personnel that are not employed by either the predecessor company or the purported successor in interest. Accordingly, for the same reasons that the Court rejected Plaintiff's ar-

---

**13.** COMTek even agreed to honor MPRI's "incumbent tenure for seniority based benefits."

*Murphree,* 460 F.Supp.2d at 709.

gument regarding continuity of employees, the Court finds that Plaintiff's argument regarding whether there is a similarity between supervisors and managers must fail, i.e., Plaintiff has conflated Green Hills and RehabCare. The question is whether *RehabCare* is a successor in interest to Progressive, which means that the primary consideration must be whether *RehabCare* had managers and supervisors similar to Progressive, *not* whether Green Hills had the same managers and supervisors during the tenure of both Progressive and RehabCare.

### 5. Whether there is a similarity of jobs and working conditions.

Defendant argues that, other than the fact that both Progressive and RehabCare provide physical therapy services, there are no genuine similarities between the jobs and working conditions of the two entities. Specifically, Defendant points out that RehabCare provides therapy services at Green Hills pursuant to its own policies and standards and under working conditions determined by RehabCare. Plaintiff counters that the therapists working at Green Hills for both Progressive and RehabCare provide the same type of care, in the same rooms, with similar equipment and forms for Medicare reimbursement.

Neither party has argued this factor differently than in the Motion for Preliminary Injunction. In its Order on that motion, the Court discussed *Smegal*, finding it useful in the analysis.[14] The Court

found that the issue in *Smegal* was fundamentally the same as the issue before this Court, and the test applied in *Smegal* was functionally equivalent to the *Leib* test. *Reynolds,* 531 F.Supp.2d at 1063–64. The Court concluded that *Smegal* "supports Defendant's position that, while performing fundamentally the same work, RehabCare's employees were subject to different working conditions than were Progressive's employees, by virtue of different organizational policies and procedures." *Id.* at 1064. In its Order on Plaintiff's Motion for Preliminary Injunction, the Court "[could not] say that this factor weighs in favor of one side or the other, given the different working conditions and requirements of Progressive and RehabCare." *Id.* This conclusion is equally appropriate on the present record.

### 6. Whether there is a similarity of products or services.

Plaintiff asserts that this factor weighs in her favor because Progressive and RehabCare each provided the same services at Green Hills. Defendant admits that the general rehabilitation services provided are fundamentally the same, but emphasizes that specific services provided to any particular patient may differ from one rehabilitation provider to another. Thus, since the specific services provided are subject to the professional judgment of the therapist involved, the services provided by RehabCare are not necessarily the same as those provided by Progressive.

---

14. In *Smegal*, a case arising under Labor Management Relations Act ("LMRA"), the sole question before the court was whether Gateway Foods of Minneapolis, Inc. was a successor employer to National Super Markets, Inc. ("NSM"), such that it was obligated to adhere to the terms of a collective bargaining agreement between NSM and a local union. 819 F.2d at 192. The Eighth Circuit Court of Appeals relied on the fact that the "major test for a successor employer is whether there is substantial continuity between the new operation and the old, particularly with regard to the employees." *Id.* at 193. The Court of Appeals found that the district court was not clearly erroneous in finding that Gateway was not a successor to NSM, since the NSM employees made up only a minority of the new group, because their work and working conditions had changed, and because the services offered had changed. *Id.*

Defendant's position on this factor, while technically true, does not undermine the similarity in services provided by Rehab-Care and Progressive. Accordingly, the Court finds, as it did with respect to Plaintiff's Motion for Preliminary Injunction, that this factor weighs somewhat in favor of Plaintiff.[15]

Having considered all of the Department of Labor/*Leib* factors, the Court finds, based on the evidence now before it, that no reasonable jury could conclude that RehabCare is a successor in interest to Progressive. Plaintiff cannot demonstrate a continuity of business operations, a continuity of employees, or a similarity in supervisors and managers. *See* 20 C.F.R. § 1002.35 ("In general, an employer is a successor in interest where there is a substantial continuity in operations, facilities, and workforce from the former employer."). While the services provided by both Progressive and RehabCare are generally the same, the only continuity in facilities, machinery, methodology, and working conditions comes from the fact that rehabilitative services are fairly uniform from one provider to another and the fact that the rehabilitative services provided in this case were provided by both companies at an identical location.

In reaching this conclusion, the Court is mindful of its obligation to liberally construe the provisions of USERRA in favor of Plaintiff. *See, e.g., Clegg v. Ark. Dept. of Correction,* 496 F.3d 922, 931 (8th Cir.2007) ("Because USERRA was enacted to protect the rights of military service members and veterans it is construed broadly and 'in favor of its military beneficiaries.'"); *Coffman,* 411 F.3d at 1238 ("USERRA 'is to be liberally construed for the benefit of those who left private life to serve their country.'" (citations omitted)); *Gordon v. Wawa, Inc.,* 388 F.3d 78, 81 (3d Cir.2004) ("[W]e construe USERRA's provisions liberally, in favor of the service member."); *Hill v. Michelin N. Am., Inc.,* 252 F.3d 307, 312–13 (4th Cir.2001) ("Because USERRA was enacted to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries."); *Chance v. Dallas County Hosp. Dist.,* 176 F.3d 294, 296 n. 14 (5th Cir.1999) ("The legislative history does reveal that the USERRA is to be 'liberally construed.'"); *McGuire v. United Parcel Serv.,* 152 F.3d 673, 676 (7th Cir.1998) ("USERRA is to be liberally construed in favor of those who served their country."). This obligation for liberal construction does not, however, require the Court to

---

15. The Court reiterates its conclusion from the Order on Plaintiff's Motion for Preliminary Injunction that this factor weighs only marginally in favor of Plaintiff.

Much testimony was presented about efforts by Green Hills to become a skilled nursing facility. Plaintiff admits that Progressive ended its contract with Green Hills because it was either unable or unwilling to provide services to Green Hills once Green Hills became a skilled nursing facility. To become a skilled nursing facility under Medicare, Green Hills needs a separate Medicare certification, and has many additional requirements, over and above those that it made available on an outpatient basis. Hr'g Tr. at 69. Plaintiff admitted further that the rehabilitation services provided to a skilled nursing facility would likely be more frequent than for outpatient services, and that the paperwork is monitored more closely. *Id.* at 69. Progressive provided outpatient services as part of its contract with Green Hills, but did not provide skilled nursing facility services. *Id.* at 64. Though Green Hills had not yet become a skilled nursing facility at the time of Plaintiff's return from active duty, and indeed has not to date become a skilled nursing facility, this difference between services provided by Progressive and those that will eventually be provided by RehabCare tempers to some extent the conclusion that the similarity of products and services factor weighs in Plaintiff's favor.

*Reynolds,* 531 F.Supp.2d at 1064 n. 8.

discard traditional concepts of fairness and reasonableness in a strained effort to find liability where none actually exists. *See, e.g., Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 285, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946) (finding that liberal construction did not warrant the "distort[ion]" of the language of a USERRA precursor); *Aull v. McKeon–Grano Assoc., Inc.*, No. 06–2752, 2007 WL 655484, at *6 (D.N.J. Feb. 26, 2007) ("[E]ven a liberal construction [of USERRA] must have some limits.").

On the undisputed facts of this case, Plaintiff was an employee of Progressive. She was assigned to work at Green Hills, but the terms of her employment, her rate of pay, benefits, schedule, and seniority were entirely dictated by Progressive. She could only be disciplined or terminated by Progressive. Indeed, the Court is unaware of any obligation by Progressive to maintain Plaintiff's employment at Green Hills, as opposed to at some other location where Progressive had contracted to provide services. Moreover, neither Plaintiff nor Progressive had any relationship with RehabCare. RehabCare did not assume Progressive's contract with Green Hills. It did not buy any equipment from Progressive or hire any Progressive employees. Successor liability, as Plaintiff points out in her brief, was developed to prevent situations where " 'the victim of the predecessor's behavior may be left without a remedy unless recourse against the successor is allowed.' " Pl.'s Br. at 13 (quoting *Holland v. Williams Mountain Coal Co.*, 256 F.3d 819, 825 (D.C.Cir.2001)). Successor liability is "fair," however, partly because a business entity that steps into the shoes of another business entity knows, or reasonably should anticipate, that its actions may cause it to acquire

both the benefits and the liabilities of the predecessor. To adopt Plaintiff's position and hold that RehabCare is Progressive's successor in interest based simply on the fact that each had a contract to provide substantively similar rehabilitation services at Green Hills would undermine this entire premise. That is, any service contractor could be found a successor in interest to virtually any predecessor contractor based, not on its own affirmative actions or decisions, but solely on factors and circumstances entirely external to that service contractor and entirely external to the decision to contract in the first instance. The repercussions of such an outcome are simply untenable.[16] Accordingly, the Court concludes as a matter of law that RehabCare is not a successor in interest to Progressive. It, therefore, cannot be held liable under USERRA for failing to "reemploy" Plaintiff in her former position at Green Hills.

### B. *Plaintiff's Discrimination Claim under 38 U.S.C. § 4311*

Plaintiff's Complaint also alleges that Defendant discriminated against her on the basis of her military service, in violation of 38 U.S.C. § 4311. Plaintiff specifically alleges in Count 1: 1) RehabCare is an "employer" as that term is defined by USERRA; 2) RehabCare denied Plaintiff employment, reemployment, or a benefit of employment; and 3) Plaintiff's military service was a motivating factor in RehabCare's decision to deny Plaintiff these employment opportunities. Compl. ¶¶ 23–27.

USERRA provides:

(a) A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, re-

---

**16.** For example, service contractors would be loathe to enter into contract without a full inquiry and investigation into every other vendor who previously provided like services for fear of some unforeseen liability arising under the doctrine of successor in interest.

tention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

. . .

(c) An employer shall be considered to have engaged in actions prohibited—

(1) under subsection (a), if the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service.

38 U.S.C. § 4311 (emphasis added). The Eighth Circuit articulated the standards for evaluating a USERRA discrimination claim in *Maxfield v. Cintas Corp. No. 2*:

"USERRA, enacted in 1994 to improve the Veterans' Reemployment Rights Act ('VRRA'), prohibits employment discrimination on the basis of military service." *Gagnon v. Sprint Corp.*, 284 F.3d 839, 852 (8th Cir.2002), abrogated on other grounds, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). An employer violates USERRA "when a person's membership in the uniformed services is a motivating factor in the employer's action, 'unless the employer can prove that the action would have been taken in the absence of such membership, ... or obligation for service.'" *Id.* (quoting 38 U.S.C. § 4311(c)(1)). "Unlike the *McDonnell Douglas* framework [utilized in Title VII claims], the procedural framework and evidentiary burdens set out in section 4311 shift the burden of persuasion, as well as production, to the employer." *Id.* at 854. Under USERRA, an employee must make "'an initial showing ... that military status was at least a motivating or substantial factor in the [employer's] action.'" *Id.* (quoting *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1014 (Fed.Cir.2001)). If the employee makes such a showing, "'the [employer] must prove, by a preponderance of evidence, that the action would have been taken despite the protected status.'" *Id.* (quoting *Sheehan*, 240 F.3d at 1014).

427 F.3d 544, 551 (8th Cir.2005).

Plaintiff contends that it is apparent from the record that Plaintiff's military service was a "motivating factor" in Defendant's employment decisions. It is not entirely clear, however, precisely *what* employment decision Plaintiff contends Defendant made in a discriminatory fashion. Presumably, Plaintiff objects to either Defendant's decision not to "reemploy" her under USERRA or Defendant's decision not to hire her in the event that it was not obligated to "reemploy" her. Plaintiff argues that a reasonable jury could find that "the contract signed by Defendant would have permitted it to hire Plaintiff at her former and requested rate of $51.28/hour and that Defendant's inconsistent reasons for refusing to do so could be masking a discriminatory animus toward Plaintiff based on her military status." Pl.'s Br. at 32.

As noted *supra*, in all her interactions with RehabCare, Plaintiff was insistent that she had a right to be "reemployed" at the Green Hills facility, pursuant to USERRA, on terms generally equivalent to those she enjoyed at Progressive.[17] Spe-

---

**17.** As noted previously, at the time of her deployment, Plaintiff was receiving $51.28 per hour as an employee of Progressive. She worked 30 hours per week, had three weeks

cifically, Plaintiff requested a "PRN" [18] position at a rate of $65 per hour, though at some point in time she did reduce her request to $51.28 per hour with additional benefits.[19] In the meeting between Violette and Plaintiff on July 27, 2007, Violette had three offers of employment to present to Plaintiff, one for full time employment, one for part time employment, and one for PRN status.[20] Def.'s Material Facts ¶ 57. During the meeting, Violette informed Plaintiff that RehabCare did not believe that it had an obligation to "reemploy" her under USERRA, but that the offers of employment were "good, fair rates, market rates...." Def.'s Supp.App. (Violette Dep. at 72). Plaintiff declined to hear the offers, maintaining that "if they are not going to honor the USERRA law and reinstate me into my job that I had prior to leaving, I didn't want to hear the offer." Hr'g Tr. at 83; see also Def.'s Supp.App. (Pl.'s Dep. at 116–17) ("I didn't ever talk to anyone at RehabCare on specifics of an offer. Melissa and I decided that if, you know, they weren't going to recognize USERRA, we wouldn't talk about an offer because that was—I didn't feel—I felt I should be coming back into my job, not an offer."). It was only after filing the present lawsuit that Plaintiff heard from her attorneys what the offers were, though she declined to accept them even at that point in time. Def.'s Supp.App. (Pl.'s Dep. at 116–17) ("My attorney has talked to RehabCare about an offer later.").

■ As discussed extensively in the previous section, Plaintiff was incorrect in her belief that RehabCare was her "employer" for purposes of USERRA "reemployment" under § 4312. Hence, RehabCare was entirely warranted in declining to "reemploy" Plaintiff on terms and conditions that were the same or equivalent to those Plaintiff enjoyed at Progressive. Plaintiff's claim, accordingly, could only survive if RehabCare, motivated at least in part by a discriminatory animus toward Plaintiff's military service, "denied initial employment" to her. The facts are clear, however, that RehabCare did not deny Plaintiff initial employment. It made every effort to offer Plaintiff the position she sought, but Plaintiff refused to even hear the offers, let alone to entertain them.[21]

of annual vacation, and was allowed to participate in the Progressive's 401K program. Hr'g Tr. at 39

**18.** A "PRN" physical therapist is employed on an "as needed" basis and generally receives a higher rate of pay in lieu of benefits. Def.'s Material Facts ¶ 51; Pl.'s Response ¶ 51.

**19.** Plaintiff testified that she requested $65 per hour because PRN positions do not get benefits and because she had been told that "if you don't receive any benefits, that [30% should be added] on to your basic pay." Hr'g Tr. at 37. Thus, in Plaintiff's mind, $65 per hour in a PRN position would be approximately equivalent to her previous rate of pay with benefits.

**20.** RehabCare's offers of employment were for: "$35/hr with benefits after 32 hours/week"; "part time position at $40/hr with partial benefits (vacation, Professional Choice Account)"; and "on-call PRN position at $45/hr without benefits but with 401(k) that

matches 50% of 1 st 4%." Pl.'s App. at 226; see also Def.'s Supp.App. (Violette Dep. at 71–72).

**21.** To the extent that Plaintiff argues that Defendant deprived her of a "benefit of employment" or of "initial employment" by making "lowball" pay offers, her claim also must fail. The evidence in the record supports a finding that RehabCare attempted to make offers of employment to Plaintiff that provided reasonable compensation by RehabCare's standards. See Def.'s Material Facts ¶¶ 49 ("In the geographic area in question, which includes the Green Hills Retirement Community in Ames, Iowa, RehabCare's highest paid full time physical therapist makes $36.00 per hour."); 50 ("RehabCare currently has no part-time physical therapists working in this geographic area."); 51–54 (providing that PRN physical therapists in this geographical region have a "recommended target hourly rate" of $40.00 per hour according to Violette, but that a few PRN therapists make $50.00 or more per

The Court also rejects Plaintiff's contention that comments by RehabCare employees support a conclusion that Defendant's decisions regarding employing her were motivated by military discrimination. Plaintiff cites the following "facts" in support of this proposition: 1) Defendant viewed Plaintiff and her claims under USERRA as a "distraction"; 2) Defendant made negative comments about Plaintiff and her assertion of USERRA rights; 3) Defendant developed a "game plan" in 2007 to deal with Plaintiff but none of its employees remember what that "game plan" was or who developed it; and 4) Defendant referred to Plaintiff as "beloved" by Copple and referred to not hiring her as a "bomb" to be dropped on Copple.

When viewed in context, however, the comments to which Plaintiff refers do not support a discriminatory animus, but rather actually reveal significant efforts by RehabCare to employ Plaintiff under mutually agreeable terms pursuant to RehabCare's contract to provide services at Green Hills. For example, the "distraction" and "gameplan" references were made in response to an email from Violette to Curtis Davies ("Davies"). Violette told Davies that "[Plaintiff] called me again just now and wanted to remind me about USERRA.... As she is really going to push this USERRA thing and is confident that it includes her situation I will probably need your help Curt in handling this when the time comes." Pl.'s App. at 204. Davies replied:

Let's stick to our gameplan. Don't get distracted by her throwing out USERRA language. USERRA requires her employer to reemploy her. She has never worked for us. Once we have the financials and the Performa on this facility, we will determine rates of pay for those coming to work for us using the normal process.

*Id.*

Similarly, Plaintiff's claim of "negative comments" is a mischaracterization of the record. Plaintiff specifically references a comment that Plaintiff was "holding the contract hostage." The actual context of the comment, however, reveals that RehabCare had become aware of Plaintiff's demand for $65 per hour and was still attempting to finalize its contractual agreement with Green Hills, knowing that Copple wanted Plaintiff to continue providing rehabilitation services at Green Hills. Pl.'s App. at 206–07. Colleen Jones ("Jones") stated that if Plaintiff "attempts to hold this contract 'hostage' for $65/hr," Jones had been instructed to contact LifeCare and "they will speak directly with Rod [Copple]." *Id.* at 206. And Jones' reference to "Copple's 'beloved Pam,' " and a "bomb," when placed in full context, was clearly an effort to ensure full disclosure in the ongoing negotiations between Green Hills and RehabCare: "Does Rod [Copple] know and understand that we may not hire her if she won't come down on her rate? I wouldn't want Rod to tell [LifeCare] we 'tricked' him into signing the contract and

---

hour and that one makes $75 per hour, but is utilized only occasionally in "dire" situations); 55 (discussing that one factor considered in determining RehabCare's wage rates is "the hourly reimbursement rate to which RehabCare is entitled under its contract with a facility such as Deerfield"). The mere fact that Plaintiff did not believe the offers were reasonable once she actually found out what they were during the course of the present

litigation does not automatically give rise to an inference that a jury could conclude the offers were unreasonable, let alone that they were unreasonable due to a discriminatory animus. Regardless, even under the most liberal construction of the USERRA statute, the Court is hard-pressed to say that the content of RehabCare's offers is even relevant given that Plaintiff refused to hear them in the first instance.

then he doesn't get his beloved Pam because we waited until the ink was dry to drop the bomb." Pl.'s App. at 209. Though perhaps distasteful or inarticulately stated, the Court concludes that no reasonable jury could find that such comments are indicative of discrimination.

## IV. CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment (Clerk's No. 33) is GRANTED as to both Counts of Plaintiff's Complaint.

IT IS SO ORDERED.